PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 10-1198
_____

UNITED STATES OF AMERICA

v.

ALI AMIRNAZMI,
                              Appellant
_____

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
D.C. Criminal No. 2-08-cr-00429-001
(Honorable Cynthia M. Rufe)
_____

Argued January 11, 2011

Before: SCIRICA, BARRY and VANASKIE, *Circuit Judges*.

(Filed: May 13, 2011)

ELIZABETH K. AINSLIE, ESQUIRE (ARGUED)
VINCENT A. LaMONACA, ESQUIRE
Schnader Harrison Segal & Lewis
1600 Market Street, Suite 3600
Philadelphia, Pennsylvania 19103
        Attorneys for Appellant

BERNADETTE A. McKEON, ESQUIRE (ARGUED)
STEPHEN A. MILLER, ESQUIRE
Office of United States Attorney
615 Chestnut Street, Suite 1250
Philadelphia, Pennsylvania 19106
        Attorney for Appellee

_____

OPINION OF THE COURT
_____

SCIRICA, *Circuit Judge*.

In pursuit of his stated goal of transforming the Islamic Republic of Iran into a global chemical powerhouse, Ali Amirnazmi, a chemical engineer, marketed a dynamic software program to Iranian actors and entered into agreements with various Iranian entities in which he pledged to provide technology to facilitate the construction of multiple chemical plants. Following a jury trial, Amirnazmi was convicted on ten charges—four counts stemming from violations of the International Emergency Economic Powers Act (IEEPA), three counts of making false statements, and three counts of bank fraud. Amirnazmi moved both for a

judgment of acquittal and for a new trial. The District Court denied both motions and sentenced him to a four-year prison term. We will affirm.

I.

Amirnazmi, a dual citizen of the United States and Iran, founded a company called TranTech Consultants, Inc., in 1981. Billed as a business geared toward providing "an innovative approach to strategic decision making for the Chemical Process Industries," TranTech marketed its primary product—a computer software program called ChemPlan—as an "exclusive, fully integrated, worldwide database" designed to allow chemical companies to assess product viability and cost based on a number of variables. ChemPlan had two principal functions. As a database that illuminated how chemical reactions could be disaggregated into their component parts, it included both public information and proprietary data derived from Amirnazmi's expert analysis of the various processes.[1] And as a dynamic planning tool, ChemPlan enabled end users to determine individualized production costs and the feasibility of embarking on prospective projects by allowing them to change the input

---

[1] ChemPlan's licensing agreement alerted software purchasers to the proprietary nature of the database, indicating it contained "valuable TRADE SECRET and confidential, unpublished information developed or acquired by TranTech at great expense, including data, data structure, data processing algorithms, innovations and concepts."

3

variables in order to generate "what if" scenarios accounting for market fluctuations. These features made ChemPlan attractive to major manufacturers such as the Dow Chemical Company, LyondellBasell Industries, and Rohm and Haas Company.

Aiming to facilitate Iran's transformation into "an independent chemical powerhouse,"[2] and seeking to spur "a flow of Iranian[ ] [scientists] back to Iran" where he would ultimately join them to impart his expertise,[3] Amirnazmi began, in the mid-1990s, to explore business partnerships with Iranian entities. First, he initiated efforts to sell ChemPlan to the state-owned National Petrochemical Company of Iran (NPC). In August 1997, TranTech and NPC executed a Software/Data License Agreement whereby NPC agreed to purchase a subscription to ChemPlan for $64,000. Amirnazmi directed NPC to wire payment to a European bank account, and he traveled to Iran to demonstrate the product's functionality to NPC officials. In 1998, NPC purchased a software update for $18,000. In 2000, NPC enlisted Amirnazmi's assistance in its quest to obtain an off-the-shelf software package called BoxScore, a suite of programs manufactured in the United States and consequently unavailable to Iranian entities affected by U.S. trade

---

[2] Letter from Ali Amirnazmi to Mrs. F. Parvaresh, Manager, National Petrochemical Company of Iran (April 30, 1998).

[3] Email from Amirnazmi to Mr. Robert G. Williamson, Attorney at Law (undated).

sanctions. Amirnazmi procured the software, sent it to an intermediary in Germany, and charged NPC $667.85 for his efforts.

Amirnazmi met in person with NPC personnel at a 2000 international petrochemical conference held in Iran. Thereafter, he sent NPC's Director of Planning and Development a letter in which he encouraged NPC to renew its ChemPlan subscription and proposed three options—including the formation of a joint venture—for tailoring ChemPlan to NPC's unique needs. Amirnazmi attended the same conference in 2001 and again attempted to solicit NPC interest in a customized ChemPlan package by sending an NPC contact several renewed proposals along with subscription order forms.

In 2002, Amirnazmi endeavored to engage an Iranian company to handle its advertising and promotional efforts. In connection with this deal, Amirnazmi attempted to transfer $250 to an Iranian bank account. The U.S. bank declined to complete the transaction, and the Treasury Department's Office of Foreign Assets Control (OFAC) requested from Amirnazmi a detailed explanation for this attempted transfer. Amirnazmi responded that he had not known such a transaction was prohibited by the sanctions then in place against Iran.[4]

---

[4] OFAC, the arm of the U.S. Treasury Department responsible for administering the regulations implementing the embargo against Iran, had previously flagged

5

After indicating he was willing to conduct business with Iran, Amirnazmi was granted a private audience with Iranian President Mahmoud Ahmadinejad at an event in New York City in September 2006. At this meeting and in subsequent correspondence, Amirnazmi expressed his desire to transfer ChemPlan's technical and economic knowledge to Iran and sought President Ahmadinejad's assistance in helping him return to Iran so that he might serve the country in his "field of expertise."[5] In a January 2007 letter, Amirnazmi beseeched President Ahmadinejad to arrange an in-person meeting in Tehran so that he might unveil his "plan" to help Iran, and he decried the United States' "cruel and tyran[nical]" treatment of the Iranian people.[6]

Having brought himself to President Ahmadinejad's attention, Amirnazmi's efforts to improve Iran's chemical

---

Amirnazmi's attempt to wire the registration fee for the 2000 petrochemical conference to an Iranian bank. After Amirnazmi's local bank informed him it could not forward funds to a bank owned or controlled by Iranian authorities, the conference organizers waived Amirnazmi's attendance fee.

[5] Letter from Amirnazmi to Mahmoud Ahmadinejad, President of the Islamic Republic of Iran (Nov. 7, 2006).

[6] Fax from Amirnazmi to Ahmadinejad (Jan. 24, 2007) (as read from the witness stand by Special Agent Eugene Robert Lanzillo, Jr.).

capacities began to show results. In December 2007, Amirnazmi (on behalf of TranTech) signed a Memorandum of Understanding with the Institute for Business Analysis and Consultancy (IBACO), an Iranian company, regarding the provision of technology for a proposed polyvinyl butyral chemical plant to be constructed in Iran. In May 2008, Amirnazmi entered into a separate confidentiality agreement with IBACO in which he agreed to have TranTech provide software licensing, equipment and chemicals in connection with the construction of a glacial acrylic acid and super absorbent polymer plant in Iran.

Amirnazmi and NPC rekindled their working partnership in 2008, entering into a new licensing agreement for the ChemPlan software. During the negotiations leading up to this agreement, Amirnazmi represented that the 1997 ChemPlan licensing agreement was "still valid."[7] And in June 2008, Amirnazmi entered into a Memorandum of Understanding with the Nokhbegan Institute of Technology Development (NITD), an Iranian company, to create a joint venture to provide software, database and technology transfer services to clients in the chemical process industry. Under the agreement, Amirnazmi pledged to have TranTech transfer the ChemPlan system to a newly-formed company in Iran in which TranTech would have been the majority shareholder.

The Memorandum of Understanding with NITD expired by its own terms after two months. The 2008

_____

[7] Fax from Amirnazmi to Mr. Gorbanpour, NPC official (Feb. 26, 2008).

licensing agreement with NPC, which was signed by the counterparties and which fixed the subscription fee at $270,000, was to become effective upon installation of ChemPlan on NPC hardware. Amirnazmi twice met with IBACO officials in 2008 to negotiate the terms of a formal contract covering the polyvinyl butyral plant, but the resulting Technology Transfer and Construction Agreement was never signed by the parties. And the IBACO confidentiality agreement concerning the super absorbent polymer plant contemplated further elucidation within the framework of a formal contract drafted upon "finalizing negotiation[s] with investors."

Amirnazmi drew the attention of U.S. Customs and Border Protection by traveling to Iran in 2007 and twice more in 2008. Customs agents interviewed Amirnazmi upon his return to the United States in both April and June of 2008. Upon questioning, he claimed both trips were to visit his elderly mother and that the latter trip also permitted him to attend a petroleum conference. Although Amirnazmi repeatedly disavowed any commercial purpose for his travels, the presence of ostensibly business-related possessions cast doubt on the credibility of his responses. In April he claimed the sundry business cards and documents found in his briefcase were personal effects he had not made use of on his trip. In June 2008, confronted by Customs officials with computer files and hard copy documents detailing plans to build chemical plants in Iran, he declined to offer an explanation.

8

On June 4, 2008, the day after his second encounter with Customs officials, Amirnazmi contacted the OFAC compliance hotline to inquire in general about U.S. restrictions on commercial activity with Iran. Without either delving into the specifics of how ChemPlan operated or mentioning his prior business dealings with Iranian companies, he asked whether making public documents available on a website would fall within the informational-materials exemption to IEEPA and whether exporting an unidentified "good" would theoretically require dispensation in the form of a license issued by OFAC.

Two days after this telephone conversation, Amirnazmi was questioned by agents from the Internal Revenue Service and the Federal Bureau of Investigation. He acknowledged meeting President Ahmadinejad but denied having conducted business on either of his 2008 trips to Iran, and he claimed his only two financial transactions with Iran had been the disallowed wire transfers much earlier in the decade. The agents subsequently obtained a search warrant for Amirnazmi's business. Despite Amirnazmi's protestations that none of the documents named in the warrant were located on the premises, the authorities seized numerous physical documents and the hard drive from his computer, which also contained pertinent documents. Upon further interrogation, Amirnazmi conceded he had business relations with NPC both in 1997 and in the more recent past, and he acknowledged having met with Iranian state officials during his trips abroad.

II.

On July 24, 2008, the government filed a ten-count indictment against Amirnazmi in the Eastern District of Pennsylvania charging him with (1) one count of conspiracy to violate IEEPA, in violation of 18 U.S.C. § 371; (2) four substantive counts of violating IEEPA, in violation of 50 U.S.C. § 1705, and of aiding and abetting the same, in violation of 18 U.S.C. § 2; (3) one count of conspiracy to act as an illegal agent of a foreign government, in violation of the Foreign Agents Registration Act (FARA) and in violation of 18 U.S.C. § 371; (4) one substantive count of acting as an illegal agent of a foreign government, in violation of 18 U.S.C. § 951, and of aiding and abetting the same, in violation of 18 U.S.C. § 2; and (5) three counts of making false statements to government officials, in violation of 18 U.S.C. § 1001. On October 2, the government filed a superseding indictment, charging Amirnazmi with three additional counts of bank fraud, in violation of 18 U.S.C. § 1344, and supplementing the original indictment with further factual allegations.

Prior to trial, Amirnazmi filed a motion to dismiss in which he alleged (1) IEEPA regulations are the product of an unconstitutional delegation of legislative authority to the Executive; and (2) portions of the superseding indictment referencing conduct that occurred more than five years prior to the indictment should be barred by the statute of limitations. The court denied the motion, concluding IEEPA does not violate the nondelegation doctrine and that Amirnazmi's actions prior to 2003 were part of a continuing course of conduct that extended into the limitations period and contributed to the charged conspiracy. *See United States*

*v. Amirnazmi*, No. 08-CR-0429-01, 2009 U.S. Dist. LEXIS 624 (E.D. Pa. Jan. 5, 2009).[8]

The jury convicted Amirnazmi on all but one of the IEEPA counts and on all of the false statement and bank fraud counts.[9] Amirnazmi was acquitted of the FARA violations charged in Counts Six and Seven. Amirnazmi moved for a judgment of acquittal under Fed. R. Crim. P. 29 on the IEEPA counts, the false statement counts and one of the bank fraud counts. He reiterated his argument that IEEPA

---

[8] Also prior to trial, the government moved to admit audio recordings and transcripts of certain conversations in which Amirnazmi had participated while in pretrial custody. Amirnazmi moved to suppress, arguing the government had used trial subpoenas to conduct further investigation after the indictment had been returned in violation of Fed. R. Crim. P. 17(c). The court determined the subpoenas properly directed the custodian of records to appear with the documents on dates that corresponded with scheduled proceedings in the case and consequently allowed the government to admit the evidence.

[9] Amirnazmi was found not guilty on Count Three of the superseding indictment, which charged him with violating IEEPA by entering into an agreement with the Research Institute of Petroleum Industry, a division of Iran's Ministry of Petroleum, in which he agreed to conduct negotiations with a Danish chemical company for the purpose of establishing a joint venture in Iran.

unconstitutionally delegates to the Executive authority to criminalize commercial conduct, and he added an argument that the accompanying OFAC regulations under which he was convicted are unconstitutionally vague. He also argued the evidence was insufficient to prove his conduct did not fall within IEEPA's informational-materials exemption and that the government failed to prove IEEPA required him to obtain a license to engage in his activities. The court denied Amirnazmi's motion in its entirety. It rested on its previous ruling concerning the nondelegation doctrine, concluded that the IEEPA regulations are not unconstitutionally vague, and determined the government had produced sufficient evidence to sustain each conviction. *See United States v. Amirnazmi*, No. 08-CR-0429-01, 2009 U.S. Dist. LEXIS 74833 (E.D. Pa. Aug. 21, 2009).

Amirnazmi also moved for a new trial under Fed. R. Crim. P. 33. Amirnazmi reiterated his claims that the prison tapes were improperly obtained and should not have been admitted and that evidence of his conduct prior to 2003 should have been barred by the statute of limitations. The court denied this motion, resting on its previous ruling with respect to the tapes and concluding Amirnazmi's pre-2003 actions fell within the scope of his conspiracy "to bring his technical wherewithal, especially the ChemPlan system, back to Iran for the benefit of that country." *See United States v. Amirnazmi*, 648 F. Supp. 2d 718, 723 (E.D. Pa. 2009).

As noted, the District Court sentenced Amirnazmi to a 48-month term of imprisonment followed by five years' supervised release. Amirnazmi timely appealed.[10]

## III.

On appeal, Amirnazmi principally challenges the constitutionality of IEEPA and the accompanying OFAC regulations. We will first address the constitutionality of the statute itself, which Amirnazmi challenges on two fronts. First, he argues that Congress—when delegating the authority to create criminal offenses—must articulate the standards by which executive conduct will be governed with greater precision than is required in the context of delegations of civil authority. IEEPA, Amirnazmi contends, lacks the requisite specificity. Second, he claims Congress's failure to comply with its statutory responsibility to oversee the implementation of the Iranian sanctions regime left the Executive's discretion wholly unchecked. Because IEEPA reserves for Congress the final word in determining trade policy during peacetime emergencies, Amirnazmi alleges, Congress's abdication of its oversight role rendered the delegation unconstitutional.[11]

---

[10] The District Court had jurisdiction under 18 U.S.C. § 3231. We have jurisdiction under 28 U.S.C. § 1291.

[11] We review challenges to the constitutionality of a statute *de novo*. *United States v. Fullmer*, 584 F.3d 132, 151 (3d Cir. 2009).

13

A.

As the source of statutory authority for the Executive's exercise of emergency economic powers in response to peacetime crises, IEEPA traces its provenance to § 5(b) of the Trading with the Enemy Act of 1917, Pub. L. No. 65-91, § 5, 40 Stat. 411, 415 (1917), as amended, 12 U.S.C. § 95a (TWEA). *Dames & Moore v. Regan*, 453 U.S. 654, 671 (1981). TWEA endowed the President with sweeping powers to regulate international trade in times of war or "national emergency," but it lacked a countervailing mechanism to divest the President of such authority once the emergency had ebbed. Because Presidents had displayed a tendency to allow "emergency" declarations to linger "even after the circumstances or tensions that had led to the declaration could no longer be said to pose a threat of emergency proportion to the Nation," some expressed concern that TWEA effectively served as a "one-way ratchet to enhance greatly the President's discretionary authority over foreign policy." *Regan v. Wald*, 468 U.S. 222, 245 (1984) (Blackmun, J., dissenting).

In an effort to address TWEA's evolution into a "flexible instrument of foreign policy in nonemergency situations," *id.* at 246, Congress amended § 5(b) in 1977, restricting the Executive's ability to act under that statute strictly to times of war, Pub. L. No. 95-223, Tit. I, § 101, 91 Stat. 1625, 1625 (1977) (striking "or during any other period of national emergency declared by the President" from the text of § 5(b)). Contemporaneously, Congress enacted the International Emergency Economic Powers Act to serve as

14

the locus of executive economic authority during national-emergency situations. *See id.* at Tit. II, 91 Stat. at 1626 (codified at 50 U.S.C. § 1701 *et seq.*). Although the powers conferred in IEEPA closely mirror those granted in its progenitor, IEEPA removed certain tools from the President's peacetime kit.[12] And, significantly for our purposes, IEEPA subjected the President's authority to a host of procedural limitations designed to ensure Congress would retain its essential legislative superiority in the formulation of sanctions regimes erected under the Act's delegation of emergency power.[13]

The predicate for an exercise of executive authority under IEEPA is the declaration of a national emergency under the National Emergencies Act (NEA). *See* 50 U.S.C. §§ 1621, 1701(b). Under IEEPA, the emergency must stem from an "unusual and extraordinary threat, which has its source in whole or substantial part outside the United States, to the national security, foreign policy, or economy of the United States." *Id.* § 1701(a). After declaring such an emergency, the

---

[12] Unlike TWEA, IEEPA does not authorize the Executive to take title to foreign assets, to regulate purely domestic transactions, to regulate gold or bullion, or to seize records. *See Regan*, 468 U.S. at 228 n.8.

[13] As explained at greater length in Section III.C.2 *infra*, Congress's reservation of a stricter oversight role in IEEPA is relevant to Amirnazmi's separation-of-powers argument.

15

President may, through "regulations . . . instructions, licenses, or otherwise,"

> (A) investigate, regulate, or prohibit —
>
>> (i) any transactions in foreign exchange,
>>
>> (ii) transfers of credit or payments between, by, through, or to any banking institution, to the extent that such transfers or payments involve any interest of any foreign country or a national thereof,
>>
>> (iii) the importing or exporting of currency or securities,
>
> by any person, or with respect to any property, subject to the jurisdiction of the United States;
>
> (B) investigate, block during the pendency of an investigation, regulate, direct and compel, nullify, void, prevent or prohibit, any acquisition, holding, withholding, use, transfer, withdrawal, transportation, importation or exportation of, or dealing in, or exercising any right, power, or privilege with respect to, or transactions involving, any property in which any foreign country or a national thereof has any interest by any person, or with respect to any property, subject to the jurisdiction of the United States . . . .

*Id.* § 1702(a)(1).

In tandem, IEEPA and NEA subject the President's exercise of emergency economic powers to an assortment of procedural requirements. The President must consult with Congress before exercising any of his powers under IEEPA "in every possible instance," and he "shall consult regularly with the Congress so long as such authorities are exercised." *Id.* § 1703(a); *see also id.* § 1703(c) (stipulating that the President must report to Congress "[a]t least once during each succeeding six-month period after" the initial exercise of any authority granted by the IEEPA). Whenever the President acts pursuant to IEEPA, he must provide Congress with a report detailing:

> (1) the circumstances which necessitate such exercise of authority;
>
> (2) why the President believes those circumstances constitute an unusual and extraordinary threat, which has its source in whole or substantial part outside the United States, to the national security, foreign policy, or economy of the United States;
>
> (3) the authorities to be exercised and the actions to be taken in the exercise of those authorities to deal with those circumstances;
>
> (4) why the President believes such actions are necessary to deal with those circumstances; and

17

(5) any foreign countries with respect to which such actions are to be taken and why such actions are to be taken with respect to those countries.

*Id.* § 1703(b). After each six-month interval, Congress "shall meet to consider a vote on a joint resolution to determine whether that emergency shall be terminated." *Id.* § 1622(b); *id.* § 1706(b) (providing for the cessation of presidential authority under IEEPA upon congressional termination of an emergency declared under NEA).

Substantively, the regulations contain several exemptions and constraints. That is, regulations promulgated under IEEPA may not impinge upon transactions incident to travel or curtail the free exchange of personal communications, humanitarian aid, or "information or informational materials." *Id.* § 1702(b). Moreover, criminal penalties under IEEPA are reserved exclusively for those who "willfully commit[ ], willfully attempt[ ] to commit, or willfully conspire[ ] to commit" a violation of any license, order or regulation issued pursuant to IEEPA. *Id.* § 1705(c). And the Act exempts those who act in "good faith" reliance on IEEPA, or on "any regulation, instruction, or direction" issued under IEEPA, from both civil and criminal liability. *Id.* § 1702(a)(3).

On March 15, 1995, President Bill Clinton issued Executive Order 12957, which declared a national emergency to deal with the "unusual and extraordinary threat" posed to the national security, foreign policy and economy of the

18

United States by "the actions and policies of the Government of Iran," and which prohibited United States involvement with petroleum development in Iran. 60 Fed. Reg. 14615 (Mar. 17, 1995).[14] On May 6, 1995, President Clinton signed Executive Order 12959, which fortified the sanctions regime by banning U.S. firms from exporting to Iran, importing from Iran, or investing in Iran, subject to the exemptions provided in IEEPA. *See* 60 Fed. Reg. 24757 (May 9, 1995); *see also* Exec. Order No. 13059, 62 Fed. Reg. 44531 (Aug. 21, 1997) (clarifying the preceding Orders). The Executive Orders authorized the Secretary of the Treasury, in consultation with the Secretary of State, "to take such actions, including the promulgation of rules and regulations . . . as may be necessary to carry out the purposes" of the Orders. *See, e.g.*, 60 Fed. Reg. 14615 at § 3. The Treasury Department subsequently issued the Iranian Transactions Regulations (ITR). *See generally* 31 C.F.R. Part 560.

Subject to limited exemptions and to licenses issued by OFAC, the ITR prohibits, in part, the "exportation, reexportation, sale, or supply, directly or indirectly, from the United States, or by a United States person, wherever located, of any goods, technology, or services to Iran or the Government of Iran," 31 C.F.R. § 560.204, and "any new investment by a United States person in Iran or in property

---

[14] The national emergency with respect to Iran has been extended annually through presidential notices. *See* Executive Documents summarized in the annotations to 50 U.S.C. § 1701.

(including entities) owned or controlled by the Government of Iran," *id.* § 560.207; *see also id.* § 560.206(a) (generally prohibiting "any transaction or dealing in or related to . . . [g]oods, technology, or services for exportation, reexportation, sale or supply, directly or indirectly, to Iran or the Government of Iran").[15] The regulations also incorporate the statutory exemption permitting the exportation of "informational materials." *Id.* § 560.210(c). Critically, this exemption does not apply to informational materials "not fully created and in existence at the date of the transactions, or to the substantive or artistic alteration or enhancement of informational materials." *Id.*

B.

---

[15] OFAC authorizes otherwise proscribed transactions through general licenses set forth in the ITR and through specific licenses issued pursuant to the procedures outlined in 31 C.F.R. Part 560, Subpart E. Whereas a general license categorically authorizes "a particular type of transaction for a class of persons without the need to apply for a license," a specific license is a "written document issued by OFAC to a particular person or entity, authorizing a particular transaction in response to a written license application." OFAC, Frequently Asked Questions and Answers, http://www.treasury.gov/resource-center/faqs/Sanctions/Pages/answer.aspx (last visited April 29, 2011).

The maxim that Congress may not delegate legislative power to the President is "universally recognized as vital to the integrity and maintenance of the system of government ordained by the Constitution." *Field v. Clark*, 143 U.S. 649, 692 (1892). Nevertheless, the Supreme Court has invoked the unconstitutional delegation doctrine—which derives its constitutional underpinning from Article I's vesting of "all legislative powers" with Congress[16]—to strike down a law only twice in its history. *See Panama Ref. Co. v. Ryan*, 293 U.S. 388 (1935) (invalidating delegation under section 9(c) of the National Industrial Recovery Act permitting the President to prohibit the interstate transportation of petroleum goods); *A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495 (1935) (striking down section 3 of the same Act, which authorized trade and industrial associations to propose "codes of fair competition" that would become legally binding if approved by the President). The Court's jurisprudence has been animated by a "practical understanding that in our increasingly complex society, replete with ever changing and more technical problems, Congress simply cannot do its job absent an ability to delegate power under broad general directives." *Mistretta v. United States*, 488 U.S. 361, 372 (1989). Accordingly, in assessing a permissible delegation, the Court has decreed it will be "'constitutionally sufficient if Congress clearly delineates the general policy, the public agency which is to apply it, and the boundaries of this delegated authority.'" *Id.* at 372-73 (quoting *Am. Power & Light Co. v. SEC*, 329 U.S. 90, 105 (1946)).

---

[16] U.S. Const. art. I, § 1.

Congress's ability to endow a coordinate branch of government with a measure of discretion is circumscribed by the requirement that it must "lay down by legislative act an intelligible principle to which the person or body authorized to [exercise the delegated authority] is directed to conform." *J.W. Hampton, Jr. & Co. v. United States*, 276 U.S. 394, 409 (1928). Whereas Congress must itself elucidate "the standards of legal obligation" in order to fulfill its "essential legislative function," it may devolve to "selected instrumentalities [responsibility for] the making of subordinate rules within prescribed limits and the determination of facts to which the policy as declared by the legislature is to apply." *Schechter Poultry*, 295 U.S. at 530. Because no one standard can account for the range of contexts in which Congress legislates, "the degree of agency discretion that is acceptable varies according to the scope of the power congressionally conferred." *Whitman v. Am. Trucking Ass'ns, Inc.*, 531 U.S. 457, 475 (2001).

The Supreme Court has upheld Congress's delegation to the President of civil authority to nullify certain attachments and transfers of assets under IEEPA. *Dames & Moore*, 453 U.S. at 675. But Amirnazmi contends IEEPA's delegation of authority to define criminal conduct is inherently more suspect and that, consequently, only a lesser degree of executive discretion is constitutionally permissible in this context. The Court has expressly refrained from deciding whether Congress must provide stricter guidance than a mere "intelligible principle" when authorizing the Executive "to promulgate regulations that contemplate criminal sanctions." *Touby v. United States*, 500 U.S. 160,

165-66 (1991). After concluding the contested delegation would pass constitutional muster even under a heightened standard, the Court refrained from resolving the petitioner's argument that criminal regulations promulgated under congressional delegations of authority should be subject to more searching scrutiny on account of the "heightened risk to individual liberty" they pose. *Id.* at 166.[17]

C.

---

[17] In *Touby*, the Court held section 201(h) of the Controlled Substances Act, which delegated to the Attorney General the authority to temporarily designate a substance as "controlled" without submitting to the full complement of procedural requirements for permanent scheduling, "meaningfully constrain[ed] the Attorney General's discretion to define criminal conduct." *Id.* at 166. The Court pointed to "multiple specific restrictions on the Attorney General's discretion" that, together, satisfied the nondelegation doctrine. *Id.* at 167. To schedule a drug temporarily, the Attorney General was required to find that doing so would be "necessary to avoid an imminent hazard to the public safety." *Id.* at 166 (citing 21 U.S.C. § 811(h)(1)). In rendering this determination, the Attorney General was "required to consider" three specific factors, ordered to publish 30-day notice of the proposed scheduling in the Federal Register and to transmit notice to the Secretary of Health and Human Services, and bound by several of the strictures for permanent scheduling ("high potential for abuse," "no currently accepted medical use"). *Id.* at 166-67.

1.

Two of our sister circuits have analyzed IEEPA's delegation of authority to criminalize conduct in light of *Touby* and have concluded the Act withstands constitutional scrutiny. In *United States v. Arch Trading Co.*, 987 F.2d 1087, 1092-94 (4th Cir. 1993), the Fourth Circuit discerned "constraining factors" in IEEPA comparable to those found sufficient in *Touby* and concluded the President's powers are "explicitly defined and circumscribed." And in *United States v. Dhafir*, 461 F.3d 211, 217 (2d Cir. 2006), the Second Circuit adopted the Fourth Circuit's logic, concluding IEEPA would satisfy even a heightened standard because "the authorities delegated are defined and limited."[18]

We too conclude that IEEPA "meaningfully constrains" the President's discretion. *See Touby*, 500 U.S. at 166. Under the Controlled Substance Act provision examined in *Touby*, the Attorney General could not temporarily schedule a drug without first finding that doing so would be "necessary to avoid an imminent hazard to the public safety." *Id.* Similarly, to activate IEEPA, the President must find that an "unusual and extraordinary threat . . . to the national

---

[18] District Courts have followed suit. *See United States v. Mirza*, No. H-06-421, 2010 U.S. Dist. LEXIS 34556, at *3-4 (S.D. Tex. Apr. 7, 2010); *United States v. Esfahani*, No. 05-CR-0255, 2006 U.S. Dist. LEXIS 1839, at *11-12 (N.D. Ill. Jan. 17, 2006); *United States v. Anvari-Hamedani*, 378 F. Supp. 2d 821, 829-30 (N.D. Ohio 2005).

security, foreign policy, or economy of the United States" originating on foreign soil has reached "national emergency" proportions. *See* 50 U.S.C. § 1701. In *Touby*, the Court found the Attorney General was constrained by the requirement that he abide by several of the more rigorous features of the permanent scheduling process designating illegal drugs. 500 U.S. at 166-67. Likewise, IEEPA prohibits the President from regulating certain exempt transactions, 50 U.S.C. § 1702(b), from prosecuting unwitting violators or holding liable those who act in good faith reliance on the statute and regulations, *id.* §§ 1705(c), 1702(a)(3), and from obviating Congress's role as ultimate arbiter of emergency trade policy, *see id.* §§ 1622(b), 1703, 1706;[19] *see also Mistretta*, 488 U.S. at 372-73 (explaining Congress must "clearly delineate[ ] the general policy . . . and the boundaries of this delegated authority").

In effecting the shift of peacetime authority from TWEA to IEEPA, Congress "placed several procedural restrictions on the President's exercise of the national-emergency powers, including congressional consultation, review, and termination." *Regan*, 468 U.S. at 249 (Blackmun, J., dissenting). In so doing, Congress reaffirmed its "essential legislative function," *see Schechter Poultry*, 295 U.S. at 530, and struck a careful balance between affording the President a degree of authority to address the exigencies of national emergencies and restraining his ability to perpetuate

---

[19] The Constitution vests the power to regulate commerce with foreign nations in the hands of Congress. U.S. Const. art. I, § 8.

emergency situations indefinitely by creating more opportunities for congressional input, *cf. Panama Ref. Co.*, 293 U.S. at 430 ("Congress has declared no policy, has established no standard, has laid down no rule").[20] Therefore, IEEPA meets the same standard of constraint outlined in *Touby*; that is, IEEPA meaningfully constrains the Executive's discretion. Accordingly, it is unnecessary for us to address the unsettled question of whether something more demanding than an "intelligible principle" is necessitated within the context of delegating authority to define criminal conduct.

2.

Second, Amirnazmi claims Congress has violated fundamental separation-of-powers precepts by neglecting its statutory responsibility to monitor the implementation of the

---

[20] Amirnazmi unconvincingly attempts to distinguish *Touby* by arguing the power to classify newly designed drugs is "far narrower" than the powers conferred by the IEEPA. The petitioner in *Dhafir* raised a similar argument, contending the *Touby* court upheld a "temporary power" to schedule controlled substances whereas IEEPA confers authority that can persist indefinitely. 461 F.3d at 217. The Second Circuit rejected this position, pointing to the need for the President to reaffirm the national emergency at regular intervals and Congress's ability to terminate the declaration as indicia of proper limitation. *Id.* We find no material durational difference between the delegations at issue here and in *Touby*.

26

Iranian sanctions regime established under IEEPA. In so doing, Amirnazmi claims, the legislature has allowed the President to arrogate "virtually unlimited power over foreign trade," thereby fomenting a "serious threat to public liberty [that] necessitates judicial intervention." This allegation implicates interrelated issues of foreign policy, congressional authorization, and statutorily mandated oversight. Because these considerations are intertwined, we consider them in concert.

The linchpin of Amirnazmi's claim is 50 U.S.C. § 1622(b), which reads: "Not later than six months after a national emergency is declared, and not later than the end of each six-month period thereafter that such emergency continues, each House of Congress shall meet to consider a vote on a joint resolution to determine whether that emergency shall be terminated." In *Dhafir*, the Second Circuit noted in passing that Congress's failure to fulfill its oversight responsibilities might conceivably raise "complicated and sensitive issues concerning separation of powers" but declined to expound in light of an inadequate factual record. 461 F.3d at 217 n.3. Given the conventional wisdom that the shift in authority from TWEA to IEEPA was inspired in part by a prevailing sentiment that Congress's role in devising emergency trade policy warranted strengthening, *see supra*

Section III.A, its failure to police executive conduct would appear counterintuitive.[21]

As a threshold matter, we must determine whether a national emergency properly declared under NEA terminates automatically when Congress fails to meet in conformance with the language of § 1622(b). In *Beacon Products Corp. v. Reagan*, 814 F.2d 1, 4 (1st Cir. 1987), the First Circuit answered that question in the negative. The court reasoned that the disparity between § 1622(d), which explicitly provides for the automatic termination of a national emergency should the President fail to extend it, and § 1622(b), which is devoid of a parallel congressional provision, suggests Congress deliberately withheld automatic termination as a remedy for violation of the "periodic meeting" clause. *Id.* at 4. Next, the court noted Congress eliminated a sunset provision from an earlier draft of NEA, reserving for itself "the burden of acting affirmatively" by substituting in that provision's place the requirement that it pass a resolution to end an emergency. *Id.* (referencing 50 U.S.C. § 1622(a)). The court then concluded Congress likely intended "to give those who want to end the emergency the chance to force a vote on the issue, rather than to *require* those who do *not* want to end the emergency to force congressional action to prevent automatic termination." *Id.* at 5. We agree that Congress did not effectively terminate the

---

[21] The parties agree that Congress has not met regularly to consider terminating the national emergency with respect to Iran.

emergency against Iran simply by virtue of its failure to hold the periodic meetings addressed in § 1622(b).

Amirnazmi contends *Beacon Products* should not control our analysis because the issue here is not merely one of statutory interpretation but instead one that requires us to consider whether Congress's failure to regularly convene to evaluate the desirability of a continued emergency trade regime violates the power-sharing program contemplated by IEEPA. That is, Amirnazmi would have us hold that Congress's assumption of a silent partner role transforms a limited delegation into a blank check that confers upon the Executive unbridled power to create trade policy. In *Dames v. Moore*, the Court wrote that IEEPA "constitutes specific congressional authorization to the President" to take certain emergency measures. 453 U.S. at 675. Following Amirnazmi's logic, the issue would then become whether protracted inaction vitiates this authorization. If this were the case, we would likely consider whether, after express authorization has ostensibly lapsed, the President's continued criminalization of certain commercial conduct has either been implicitly countenanced or whether he is in fact acting pursuant to some form of inherent authority.

The constitutionality of IEEPA's delegation of criminal authority does not rest on Congress affirmatively renewing its approval of each ongoing emergency at regular six-month intervals. Equating inaction with a withdrawal of authorization would be particularly improper with a statute that concerns foreign affairs, "a sphere in which delegation is afforded even broader deference." *Dhafir*, 461 F.3d at 215.

29

"Congress—in giving the Executive authority over matters of foreign affairs—must of necessity paint with a brush broader than that it customarily wields in domestic areas." *Zemel v. Rusk*, 381 U.S. 1, 17 (1965); *see also Veterans & Reservists for Peace in Vietnam v. Reg. Comm'r of Customs*, 459 F.2d 676, 679 (3d Cir. 1972) ("Ordinarily, when dealing with matters of foreign relations, Congress may lawfully delegate to the President broader discretion than would be permissible with regard to domestic affairs."); *United States v. Curtiss-Wright Exp. Corp.*, 299 U.S. 304, 319-20 (1936) (upholding Congress's ability to delegate the power to prohibit the sale of arms to certain countries designated by the President and explaining that it was "important to bear in mind that we are here dealing not alone with an authority vested in the President by an exertion of legislative power, but with such an authority plus the very delicate, plenary and exclusive power of the President as the sole organ of the federal government in the field of international relations"). Mindful of the heightened deference accorded the Executive in this field, we decline to interpret the legislative grant of authority parsimoniously. Congress may act to terminate the national emergency; NEA does not necessarily compel Congress to take affirmative steps to prolong the President's charted course. *See Beacon Prods.*, 814 F.2d at 4; 50 U.S.C. § 1622.

Congress's failure to satisfy the periodic meeting requirements of § 1622(b) does not ineluctably lead to a conclusion that the President's continued prosecution of trade sanctions under IEEPA has ceased to be "pursuant to an express or implied authorization." *See Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 635 (1952) (Jackson, J.,

concurring) (setting forth the familiar tripartite framework for evaluating executive action and explaining the President's power is "at its maximum" when he acts according to congressional directive). In *Haig v. Agee*, 453 U.S. 280, 300-01 (1981), the Court inferred congressional approval of a "longstanding and officially promulgated" executive policy from both inaction and statutory developments that "'left completely untouched the broad rule-making authority granted in the earlier Act.'" *Id.* (quoting *Zemel*, 381 U.S. at 12). Under *Agee*, we must generally defer to a consistent administrative construction of a statute. *Id.* at 291. "This is especially so in the areas of foreign policy and national security, where congressional silence is not to be equated with congressional disapproval." *Id.* The Court's analysis in *Agee* was buttressed by its determination that Congress had "endorsed not only the underlying premise of Executive authority in the areas of foreign policy and national security, but also its specific application" to the subject matter at issue. *Id.* at 294.

Similarly, this regulatory embargo against Iran has been in place since 1995. Far from sitting by as successive Presidents maintained a sweeping sanctions regime, Congress has expanded, deepened and formalized the sanctions in a comprehensive legislative effort to target Iran through economic measures. In 1996, Congress passed the Iran Sanctions Act, Pub. L. No. 104-172, 110 Stat. 1541 (1996) (codified in part at 50 U.S.C. § 1701 (note)), which mandated the imposition of specified sanctions against foreign firms that reached threshold levels of involvement with Iran's

31

energy sector.[22] Subsequently, in 2006, Congress passed the Iran Freedom Support Act. Pub L. No. 109-293, 120 Stat. 1344 (2006) (codified in part at 50 U.S.C. § 1701 (note)). In addition to appropriating funds earmarked for the support of persons and organizations "working for the purpose of supporting and promoting democracy for Iran," *id.* § 302, the Act placed Congress's imprimatur on executive sanctions against Iran. Under the heading "Codification of Sanctions," Congress wrote:

> United States sanctions with respect to Iran imposed pursuant to sections 1 and 3 of Executive Order No. 12957, sections 1(e), (1)(g) and (3) of Executive Order No. 12959,

---

[22] *See id.* at § 3 ("The Congress declares that it is the policy of the United States to deny Iran the ability to support acts of international terrorism and to fund the development and acquisition of weapons of mass destruction and the means to deliver them by limiting the development of Iran's ability to explore for, extract, refine, or transport by pipeline petroleum resources of Iran."). Iran has been designated a state sponsor of terrorism continuously since January 19, 1984. *Prevatt v. Islamic Republic of Iran*, 421 F. Supp. 2d 152, 156 (D.D.C. 2006). This classification has restricted the flow of goods into Iran under section 6(j) of the Export Administration Act of 1979 (codified at 50 U.S.C. App'x § 2405(j)), section 620A of the Foreign Assistance Act of 1961 (codified at 22 U.S.C. § 2371), and sections 38 and 40 of the Arms Export Control Act (codified at 22 U.S.C. § 2780).

and sections 2, 3, and 5 of Executive Order No. 13059 (relating to exports and certain other transactions with Iran) as in effect on January 1, 2006, shall remain in effect. The President may terminate such sanctions, in whole or in part, if the President notifies Congress at least 15 days in advance of such termination.

*Id.* at § 101(a). Notably, one of the provisions incorporated by reference (section 2 of Executive Order 13059) specifically prohibited "the exportation, reexportation, sale, or supply, directly or indirectly, from the United States, or by a United States person, wherever located, of any goods, technology, or services to Iran or the Government of Iran." 62 Fed. Reg. 44531.

And in 2010, Congress passed the Comprehensive Iran Sanctions, Accountability, and Divestment Act of 2010. Pub. L. No. 111-195, 124 Stat. 1312 (2010) (codified in part at 50 U.S.C § 1701 (note)). CISADA expanded the Iran Sanctions Act by targeting Iran's ability to make or import gasoline and placing new restrictions on financial institutions. *Id.* Most significantly for our purposes, however, is § 103(b)(2), in which Congress codified the prohibitions on the exportation of goods, services and technology of United States origin to Iran that were then in effect under executive orders promulgated pursuant to IEEPA. *Id.* at Tit. I, § 103, 124 Stat. at 1328-31.[23] Therefore, when Amirnazmi was tried and

---

[23] CISADA incorporated the exemptions provided in 50 U.S.C. § 1702(b), including the informational-materials

convicted, Congress had already ratified the OFAC regulations under which he was charged. And, in the aftermath of his conviction, Congress once more manifested its approval of executive conduct by again codifying the extant prohibitions on exports issued pursuant to IEEPA. These measures demonstrate Congress's approval of the emergency measures undertaken against Iran notwithstanding its failure to adhere to the meeting requirements of § 1622(b).[24]

Far from being unaware or indifferent, in the case of Iran, Congress has clearly and consistently demonstrated its support of the Executive's agenda. This is not a scenario in which we are compelled to divine the significance—if any—of congressional silence. Nevertheless, given the number of countries against which trade sanctions have been leveled

---

exemption, into this blanket codification. Pub. L. No. 111-195 at Tit. I, § 103(b)(2)(B)(i), 124 Stat. at 1328-29.

[24] Unsurprisingly, Congress's enactment of legislative sanctions against Iran coincided with its eschewing of periodic meetings to review the Executive's IEEPA-based sanctions. This reality corroborates the First Circuit's supposition in *Beacon Products* that "[f]ailure to vote likely means that few legislators wish to end the emergency. It would be odd to think that Congress would make it easier to terminate a popular emergency than an unpopular one." 814 F.2d at 4-5.

pursuant to IEEPA,[25] it is not difficult to envisage a situation in which Congress's position is less robustly documented. Although Congress's failure to periodically meet neither automatically terminates an emergency nor bespeaks its dissatisfaction with the President's policies, § 1622(b) provides a regularized mechanism for disquieted representatives to initiate a dialogue about or even contest the wisdom of continuing on with the President's strategy. Once the President has invoked his power to criminalize certain conduct under IEEPA, Congress retains an ongoing part in ensuring the Executive's actions remain "meaningfully constrained" so as to satisfy the requirements of *Touby*.[26]

---

[25] Since the statute's inception, Presidents have found "unusual and extraordinary" threats emanating from Afghanistan, Angola, Belarus, Burma, Colombia, Cote d'Ivoire, the Democratic Republic of the Congo, Haiti, Iran, Iraq, Liberia, Libya, Nicaragua, North Korea, Panama, Sierra Leone, South Africa, Sudan, Syria, the Western Balkans, and Zimbabwe. *See* Executive Documents summarized in the annotations to 50 U.S.C. § 1701.

[26] Originally, NEA provided for termination of an emergency state by "concurrent resolution" of Congress. *See Beacon Products v. Reagan*, 633 F. Supp. 1191, 1194 (D. Mass. 1986) (citing the first iteration of 50 U.S.C. § 1622(a)). However, in *INS v. Chadha*, 462 U.S. 919, 959 (1983), the Supreme Court invalidated a similar provision as an unconstitutional "legislative veto" insofar as it allowed Congress to act without obtaining the President's signature.

The Supreme Court has held that "[m]atters intimately related to foreign policy and national security are rarely proper subjects for judicial intervention," *Agee*, 453 U.S. at 292, and federal courts have historically declined to review "the essentially political questions surrounding the declaration or continuance of a national emergency," *United States v. Spawr Optical Research, Inc.*, 685 F.2d 1076, 1080 (9th Cir. 1982) (internal quotation marks omitted). Although such considerations do not preclude enforcing compliance with statutory dictates, NEA places the onus on Congress to ensure emergency situations remain anomalous and do not quietly evolve into default norms. *See Youngstown*, 343 U.S. at 654 (Jackson, J., concurring) ("[P]ower to legislate for emergencies belongs in the hands of Congress, but only

---

Subsequently, Congress amended NEA and the unconstitutional clause with one that called for termination of an emergency by "joint resolution." Pub. L. No. 99-93, Tit. VIII, § 801, 99 Stat. 405, 448 (1985) (amending 50 U.S.C. § 1622 by striking each use of the word "concurrent" and inserting in its place the word "joint"). IEEPA, on its face, permits a national emergency to be "terminated by the Congress by concurrent resolution pursuant to section 202 of the National Emergencies Act [50 U.S.C. § 1622]." *See* 50 U.S.C. § 1706(b) (2011). *Chadha* and the amendment to the cross-referenced section in NEA would appear to have rendered the words "by concurrent resolution" in § 1706(b) ineffective. "[P]ursuant to section 202 of the National Emergencies Act," Congress may only terminate an emergency via joint resolution.

Congress itself can prevent power from slipping through its fingers.").

IV.

Next, Amirnazmi argues the government failed to prove beyond a reasonable doubt that ChemPlan does not fall within the scope of IEEPA's informational-materials exemption. He contends that Congress intended to insulate transactions incident to the free flow of information from regulation and that the sale of ChemPlan, which conveys pricing information and scientific information, falls within this category of presumptively exempt activity. He urges us to vacate his convictions on Counts Two and Five of the superseding indictment, which charged him with ChemPlan-related IEEPA violations, because, he argues, OFAC's interpretation of this exemption both flouts congressional intent and is unconstitutionally vague.

Congress proscribes the Executive from regulating, pursuant to IEEPA,

> the importation from any country, or the exportation to any country, whether commercial or otherwise, regardless of format or medium of transmission, of any information or informational materials, including but not limited to, publications, films, posters, phonograph records, photographs, microfilms, microfiche, tapes, compact disks, CD ROMs, artworks, and news wire feeds . . . .

37

50 U.S.C. § 1702(b)(3). OFAC has incorporated the statutory exemption into the ITR; the regulations provide a general license authorizing transactions involving "information and informational materials." *See* 31 C.F.R. § 560.210(c)(1). Although not enumerated in the statute, technology and software are capable of qualifying as "informational materials" under the regulations. *See id.* § 560.418 ("The release of technology or software in the United States . . . to any person violates the [ITR] if made with knowledge or reason to know the technology is intended for Iran or the Government of Iran, unless that technology or software meets the definition of information and informational materials in § 560.315."). However, under OFAC's interpretation, the general license is not applicable to "transactions related to information and informational materials *not fully created and in existence at the date of the transactions*, or to the substantive or artistic alteration or enhancement of informational materials, or to the provision of marketing and business consulting services." *Id.* § 560.210(c)(2) (emphasis added).

At trial, the parties agreed to submit the issue of whether ChemPlan fell within the exemption to the jury as a factual matter, and the jury was instructed that the government had the burden of proving beyond a reasonable doubt the exemption did not apply. In his Rule 29 motion, Amirnazmi appeared to challenge the sufficiency of the evidence supporting his conviction on the IEEPA counts. The District Court, viewing the evidence in the light most favorable to the government, concluded a reasonable factfinder could have found the government had proven

38

beyond a reasonable doubt that ChemPlan was "not fully created and in existence at the date of the [relevant] transactions" and thus could have found the informational-materials exemption inapplicable. *Amirnazmi*, 2009 U.S. Dist. LEXIS 74833, at *18. In reaching this conclusion, the District Court cited Amirnazmi's description of ChemPlan as a "dynamic tool, which allows the user to generate 'what if' scenarios," as well as testimony indicating that ChemPlan packages were specifically tailored to end users and that the program allowed users to enter their own data in order to generate customized reports.

Ordinarily, our review of whether a jury verdict rests on legally sufficient evidence is "particularly deferential." *United States v. Dent*, 149 F.3d 180, 187 (3d Cir. 1998). We must "view the evidence in the light most favorable to the Government . . . and will sustain the verdict if any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* (internal quotation marks omitted). The government argues Amirnazmi has waived any claim that the exemption applies as a matter of law by accepting the proposed jury instruction. *See United States ex rel. O'Connor v. New Jersey*, 405 F.2d 632, 634 n.2 (3d Cir. 1969) (quoting *Johnson v. Zerbst*, 304 U.S. 458, 464 (1938) (defining a waiver as "an intentional relinquishment or abandonment of a known right or privilege")).

But because the jury returned a guilty verdict without specific interrogatories, we cannot say with any certainty whether it concluded ChemPlan simply did not qualify as "informational materials" or whether, as the District Court

39

surmised, it concluded the exemption was inapplicable on account of the regulatory carve-out. In federal criminal cases, a general verdict will be upheld if the government has adduced sufficient evidence in support of at least one of the alternative theories on which the jury was charged. *Griffin v. United States*, 502 U.S. 46, 49 (1991).[27] We agree with the District Court that a reasonable factfinder could have found the government proved beyond a reasonable doubt that ChemPlan was "not fully created and in existence at the date of the transactions," and was therefore subject to OFAC regulation under the ITR.[28]

---

[27] In its jury charge, the District Court quoted both IEEPA's informational-materials exemption and the regulatory carve-out within the ITR. It then stressed that "the defendant has raised this [informational-materials] exemption as an issue during trial. The government has the burden to prove beyond a reasonable doubt that the exemption does not apply."

[28] We will thus assume without deciding that the ChemPlan software could conceivably satisfy the definition of "information and informational materials" in 31 C.F.R. § 560.315. *See* 31 C.F.R. § 560.418. Nevertheless, it bears noting that OFAC has consistently treated software as conceptually distinct from other forms of informational materials. *See id.* § 560.210(c)(3) ("This section does not exempt from regulation or authorize transactions incident to the exportation of software subject to the Export Administration Regulations (15 CFR parts 730-774)."); *id.* § 560.210(c)(4) ("This section does not exempt from regulation

Amirnazmi argues reliance on this regulatory language is fatally misplaced for two reasons. First, he claims OFAC's interpretation of the informational-materials exemption is *ultra vires*. As Congress has structured IEEPA to disempower the Executive from imposing trade sanctions that impinge upon certain conduct, he argues, a regulation that undercuts this legislative charge by purporting to criminalize such conduct would be unenforceable. Second, he argues this regulation fails to inform those potentially affected by IEEPA that certain conduct is proscribed. Because the regulation did not announce with unmistakable clarity that a product of ChemPlan's nature would not fall within the general license for "informational materials," he contends, it is unconstitutionally vague.

A.

First, Amirnazmi contends OFAC's regulation removing informational materials "not fully created and in existence at the date of the transactions" from the scope of the statutory exemption reflects an impermissible agency interpretation that should be struck down under the principles enunciated in *Chevron U.S.A. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842-43 (1984). We disagree.

---

or authorize the exportation of goods (including software) . . . where such exportation . . . is for use in the transmission of any data.").

Prior to 1988, trade sanctions that hampered the exchange of informational materials were routinely justified under TWEA and IEEPA as incidental to the broader commercial purpose of these trade measures. *See, e.g.,* *Teague v. Regional Comm'r of Customs*, 404 F.2d 441, 445 (2d Cir. 1968) (upholding TWEA regulations that effected a categorical prohibition on importation of informational materials from China, North Korea and North Vietnam because the limitation was "incidental to the proper general purpose of the regulations: restricting the dollar flow to hostile nations"). In *Veterans & Reservists for Peace in Vietnam*, we wrote:

> [A] statute is not overly broad and thus violative of the First Amendment merely because it regulates incident to its scheme protected activities or property. It is only where the statute *directly* regulates speech or expression arguably protected by the First Amendment, or where as its mechanism the statute has granted discretion to a delegatee to determine whether particular items of expression may be prohibited on the basis of their content, that the question of overbreadth arises. [TWEA] Section 5(b) does not directly regulate First Amendment protected material, rather it controls transactions concerning property in which an enemy has an economic interest. The purport of the statute is clear on its face, and therefore provides guidance to the

42

> delegatee with regard to the exercise of his functions.

459 F.2d at 681. Until 1988, this line of reasoning held sway. The regulations "nominally allowed the importation of informational materials . . . but in reality banned it by requiring that the importers make payment into blocked U.S. accounts." *Walsh v. Brady*, 927 F.2d 1229, 1230 (D.C. Cir. 1991) (citing 31 C.F.R. § 515.545 (1987)).

Congress amended section 5 of TWEA and section 203(b) of IEEPA in 1988 to exempt the regulation of informational materials from the Executive's congeries of powers. *See* Omnibus Trade and Competitiveness Act of 1988, Pub. L. No. 100-418, § 2502, 102 Stat. 1107, 1371 (1988) (codified at 50 U.S.C. app. § 5(b), 50 U.S.C. § 1072(b)).[29] The amendment specifically removed from the

---

[29] The amendment restricted the Executive from regulating or prohibiting, directly or indirectly,

> the importation from any country, or the exportation to any country, whether commercial or otherwise, of publications, films, posters, phonograph records, photographs, microfilms, microfiche, tapes, or other informational materials, which are not otherwise controlled for export under section 5 of the Export Administration Act of 1979 or with respect to which no acts are prohibited by chapter 37 of title 18, United States Code.

Executive's purview the authority to regulate or prohibit such transactions "directly or indirectly." *Id.* This Berman Amendment was considered "a reaction to several seizures by the United States of shipments of magazines and books from embargoed countries and to the Treasury Department's restrictions on the permissible forms of payment for informational materials purchased from Cuba." *Kalantari v. NITV, Inc.*, 352 F.3d 1202, 1205 (9th Cir. 2003) (footnotes omitted).

In the wake of the Berman Amendment, OFAC amended its regulations to conform with the new statutory language. *See* Foreign Assets Control Regulations and Cuban Assets Control Regulations, 54 Fed. Reg. 5229 (Feb. 2, 1989) (codified at 31 C.F.R. §§ 500.206, 500.332). Paralleling the statute, the new regulations exempted informational materials, "whether commercial or otherwise," from prohibition or regulation. *Id.* Notably, however, OFAC took a narrow view of what constituted "informational materials." From the outset, OFAC reserved the right to regulate transactions related to "informational materials not fully created and in existence at the date of the transaction" and those concerning "the substantive or artistic alteration or enhancement of informational materials." *Id.* OFAC also excluded "intangible items, such as telecommunications transmissions," from the definition of "informational materials." *Id.*

---

Pub. L. No. 100-418, § 2502(b)(1)(C).

A divergence in views soon developed with regard to how expansively OFAC was required to interpret the Berman Amendment. In *Cernuda v. Heavey*, 720 F. Supp. 1544, 1549-51 (S.D. Fla. 1989), the District Court for the Southern District of Florida discerned from the legislative history of the Berman Amendment an "obvious First Amendment orientation." In holding OFAC's exclusion of original artwork from the definition of "informational materials" unreasonable, the court determined Congress had amended TWEA and IEEPA "to prevent the statute from running afoul of the First Amendment." *Id.* at 1551-53. Because original artwork merits First Amendment protection, the court concluded, OFAC could not exclude it from the sweep of "informational materials." In dictum, the court theorized that the Berman Amendment "totally *exempts* from prohibition or regulation the import of ideas and information protected by the First Amendment." *Id.* at 1550 n.10.

By contrast, in *Capital Cities/ABC, Inc. v. Brady*, 740 F. Supp. 1007, 1011-13 (S.D.N.Y. 1990), the District Court for the Southern District of New York concluded OFAC's exclusion of intangibles was consistent with the amendment's "other informational materials" language. Capital Cities had purchased the exclusive rights to televise the 1991 Pan American Games from Havana, Cuba for $ 8.7 million and agreed to remit seventy-five percent of this sum to the host organizer of the games. *Id.* at 1009-10. OFAC informed Capital Cities the proposed transaction would not fall within a general license provision and that it would not issue a specific license so long as the transaction would result in a substantial sum being transferred to Cuba. *Id.* The court found the

Berman Amendment was susceptible of multiple reasonable interpretations and found the agency's interpretation that excluded intangibles such as telecommunications worthy of deference under *Chevron*. *Id.* at 1011. In contrast to the *Cernuda* court, the *Capital Cities* court found "the legislative history reflects, at best, a general purpose to foster the exchange of ideas across national borders." *Id.*[30]

In 1994, Congress expanded this limitation on executive authority by enacting the Free Trade in Ideas Act. Pub. L. No. 103-236, § 525, 108 Stat. 382, 474 (1994) (codified as amended at 12 U.S.C. § 95a, 50 U.S.C. § 1702(b)). In part, Congress responded to OFAC's exclusion of intangible materials from the definition of "informational materials" by amending IEEPA's exemption to restrict the Executive from regulating transactions concerning informational materials "regardless of format or medium of transmission." *Id.* § 525(c)(1) (amending 50 U.S.C. §1702(b)(3)). Congress also added "compact disks, CD ROMS, artworks, and news wire feeds" to the nonexclusive

---

[30] In analyzing Capital Cities' First Amendment arguments, the court noted that "the Berman Amendment is in derogation of the Executive's constitutional authority to conduct foreign affairs by the use of embargoes on trade with hostile nations." *Id.* at 1013. Balancing this constitutional prerogative with the First Amendment issues implicated by deference to OFAC's interpretation, the court found OFAC's narrowing interpretation prudentially avoided a separation-of-powers problem. *Id.*

litany of enumerated media that could qualify as "informational materials." *Id.* The House Conference Report stated:

> [N]o embargo may prohibit or restrict directly or indirectly the import or export of information that is protected under the First Amendment to the U.S. Constitution. The language was explicitly intended, by including the words "directly or indirectly," to have a broad scope. However, the Treasury Department has narrowly and restrictively interpreted the language in ways not originally intended. The present amendment is only intended to address some of those restrictive interpretations, for example limits on the type of information that is protected or on the medium or method of transmitting the information.

H.R. Conf. Rep. No. 103-482, at 239 (1994), *reprinted in* 1994 U.S.C.C.A.N. 398, 483. Significantly, although Congress overrode OFAC's interpretation to the extent that it excluded intangible materials from the definition of "informational materials," it did not disabuse OFAC of its belief that it could permissibly regulate "informational materials not fully created and in existence at the date of the transaction." That carve-out remained in place and, to date, has not been challenged as *ultra vires*.

Before this Court, Amirnazmi relies on *Cernuda* to argue that, because ChemPlan is a product that would merit

47

First Amendment protection, it necessarily falls outside the scope of OFAC's regulatory capabilities. Although it suffused its opinion with constitutional considerations, the *Cernuda* court refrained from reaching the merits of the petitioner's First Amendment challenge to the regulations, opting instead to rest on "statutory construction and the legislative history of the [Berman] [A]mendment." 720 F. Supp. at 1553. Similarly, Amirnazmi stresses he "is not challenging his conviction under the IEEPA on First Amendment grounds." Consequently, whether ChemPlan theoretically could qualify for First Amendment protection is not the dispositive inquiry.[31] Instead, we must determine whether OFAC's

---

[31] Amirnazmi endeavors to bring ChemPlan within the ambit of First Amendment protection by analogy to two categories of speech. First, he argues ChemPlan functionally resembles the prescription drug pricing information classified as protected by *Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council*, 425 U.S. 748, 770 (1976), in that it enables consumers to make more educated decisions and thus serves the free market system by steering resources to their most productive ends. Second, he characterizes ChemPlan as "scientific expression" protected under *Miller v. California*, 413 U.S. 15, 34 (1973); *see also Universal City Studios, Inc. v. Corley*, 273 F.3d 429, 454 (2d Cir. 2001) (computer code capable of meriting First Amendment protection). Because Amirnazmi has not pursued a First Amendment challenge at any stage in this litigation, we need not determine whether OFAC's regulation would pass constitutional muster.

interpretation of the "informational materials" exemption comports with congressional intent. *See Chevron*, 467 U.S. at 843 n.9 ("The judiciary is the final authority on issues of statutory construction and must reject administrative constructions which are contrary to clear congressional intent.").

We are satisfied that OFAC's interpretation of IEEPA's informational-materials exemption is "based on a permissible construction of the statute." *Chevron*, 467 U.S. at 843. With the Berman Amendment and the Free Trade in Ideas Act, Congress sought to ensure the robust exchange of informational materials would not be unduly inhibited by OFAC. When OFAC enacted regulations that Congress considered at odds with this overarching purpose, the legislature intervened and modified the statutory language to rectify OFAC's perceived missteps. Critically, although Congress addressed one facet of OFAC's 1989 interpretation of the informational-materials exemption by stressing in 1994 that the Executive may not regulate informational materials "regardless of format or medium of transmission," it did not counteract the component of that interpretation at issue here. Presumably cognizant of OFAC's narrowing interpretations, Congress could have inserted text stipulating that the Executive may not regulate informational materials regardless of whether fully created and in existence at the date of the transactions. Although the legislative history obliquely alludes to other ways in which OFAC had interpreted the exemption in an unforeseen manner, it chose to "only . . . address some of those restrictive interpretations." *See* H.R. Conf. Rep. No. 103-482, at 239. "[W]hen Congress is aware

of an agency's interpretation of a statute and takes no action to correct it while amending other portions of the statute, it may be inferred that the agency's interpretation is consistent with congressional intent." *Barrera-Echavarria v. Rison*, 44 F.3d 1441, 1444-45 (9th Cir. 1995) (en banc) (citing *North Haven Bd. of Educ. v. Bell*, 456 U.S. 512, 535 (1982)), *superseded by statute on other grounds as stated in Kwai Fun Wong v. United States INS*, 373 F.3d 952, 972 n.26 (9th Cir. 2004).

Moreover, there is ample evidence to suggest Congress has accepted OFAC's decision to permit the circulation of informational materials already in existence while concomitantly regulating transactions that contemplate the creation of new materials. In the ITR, OFAC has fleshed out the scope of the regulatory carve-out by explaining:

> Transactions that are prohibited notwithstanding this section include, but are not limited to, payment of advances for information and informational materials not yet created and completed (with the exception of prepaid subscriptions for widely circulated magazines and other periodical publications), and provision of services to market, produce or co-produce, create or assist in the creation of information and informational materials.

31 C.F.R. § 560.210(c)(2).[32] OFAC has made a reasoned determination that Congress's paramount concern for facilitating transactions and activities incident to the flow of informational materials in-being does not reach goods and events that would not be produced but for financing from the United States (in the case of imports) or financing from purchasers in embargoed countries (in the case of exports). In the case of commercial goods, the key distinction rests between informational materials that are widely circulated in a standardized format and those that are bespoke. Whereas OFAC may not regulate the sale or transfer of prefabricated

---

[32] OFAC's general interpretation of the informational-materials exemption, in place when Congress amended the informational-materials exemption in 1994, reads:

> [P]rohibited transactions include, without limitation, payment of advances for informational materials not yet created and completed, provision of services to market, produce or co-produce, create or assist in the creation of informational materials, and payment or royalties to a designated national with respect to income received for enhancements or alterations made by persons subject to the jurisdiction of the United States to informational materials imported from a designated national.

54 Fed. Reg. 5229 (codified at 31 C.F.R. § 500.206(c)).

or mass-produced informational materials, custom-made materials crafted to suit the unique specifications of a particular purchaser are not sacrosanct. This distinction is sensible, and it reflects a permissible implementation of the statutory exemption in light of IEEPA's competing imperatives (i.e. restricting material support for hostile regimes while encouraging the robust interchange of information).

At trial, the government adduced sufficient evidence to convince a reasonable factfinder beyond a reasonable doubt that ChemPlan was not "fully created and in existence" at the date of the relevant transactions. Amirnazmi trumpeted the software's dynamism. Joseph Mehl, a computer network support technician who provided services to TranTech, testified to his belief that each ChemPlan package was "specifically tailored to the end user, depending on what industry they worked in." In aggressively pursuing commercial ties with NPC, Amirnazmi attempted to stoke his counterparty's interest by proposing several options for calibrating the software to NPC's unique needs. As explained below, the sale of ChemPlan to NPC was the cornerstone of Amirnazmi's conspiracy to bring his technical expertise to Iran for that country's aggrandizement. Consequently, the transfer of ChemPlan to Iranian purchasers does not fit neatly into the paradigm of informational exchange envisioned by Congress. Quite clearly, Amirnazmi envisioned ChemPlan as being of singular functional utility to Iranian users. Since the inception of the informational-materials exemption, OFAC has excepted such transactions from the scope of the general license.

Accordingly, we conclude that 31 C.F.R. § 560.210(c)(2) is a permissible construction of IEEPA's informational-materials exemption and is worthy of deference under *Chevron*. *See* 467 U.S. at 843. Therefore, a reasonable factfinder could have found the government proved beyond a reasonable doubt that the sale of ChemPlan to Iranian purchasers did not qualify for exemption from IEEPA as a matter of law.

## B.

Next, Amirnazmi contends OFAC's regulations are imprecisely drafted and consequently void for vagueness. His core argument is that the carve-outs to the informational-materials exemption fail to provide "clear principles." According to him, it is impossible to determine whether a work is "fully created and in existence" without necessarily invoking "an untethered subjective judgment." Again, we find Amirnazmi's argument unconvincing.[33]

---

[33] Amirnazmi has challenged all four of his IEEPA convictions on the theory that OFAC's regulations are unconstitutionally vague. He argues that the alleged vagueness of the informational-materials exemption is "exacerbated by the vagueness of other provisions in the regulations." Specifically, he argues that the amorphousness of 31 C.F.R. § 560.206(a) allowed the government to convict him for engaging "solely in preliminary negotiations with Iranian entities." However, that regulation prohibits "any transaction or dealing." *Id.* This language flatly proscribes the

"A statute is void on vagueness grounds if it: (1) 'fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits'; or (2) 'authorizes or even encourages arbitrary and discriminatory enforcement.'" *United States v. Stevens*, 533 F.3d 218, 249 (3d Cir. 2008) (quoting *Hill v. Colorado*, 530 U.S. 703, 732 (2000)). In the criminal context, "since vagueness attacks are based on lack of notice, 'they may be overcome in any specific case where reasonable persons would know their conduct puts [them] at risk' of punishment under the statute." *San Filippo v. Bongiovanni*, 961 F.2d 1125, 1138 (3d Cir. 1992) (quoting *Maynard v. Cartwright*, 486 U.S, 356, 361 (1988) (alteration in original)). Criminal statutes need only give "fair warning that certain conduct is prohibited" to survive constitutional challenges. *Id.* (internal quotation marks omitted).

Furthermore, the Supreme Court has stated that:

[E]conomic regulation is subject to a less strict vagueness test because its subject matter is

conduct for which Amirnazmi was convicted. *See United States v. Parise*, 159 F.3d 790, 797 (3d Cir. 1998) (concluding that the "plain meaning" of the term "dealings" encompassed "all interactions or contacts" that a jury could have considered as "proof of the requisite association" between a RICO defendant and an illicit enterprise). Therefore, we will confine our analysis to the regulatory carve-out and Amirnazmi's ChemPlan-related IEEPA convictions.

often more narrow, and because businesses, which face economic demands to plan behavior carefully, can be expected to consult relevant legislation in advance of action [and may] clarify the meaning of the regulation by [their] own inquiry, or by resort to an administrative process.

*Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 498 (1982). And, significantly, "the Court has recognized that a scienter requirement may mitigate a law's vagueness, especially with respect to the adequacy of notice to the complainant that his conduct is proscribed." *Id.* at 499; *see also United States v. Hescorp, Heavy Equip. Sales Corp.*, 801 F.2d 70, 77 (2d Cir. 1986) ("[A] requirement of willfulness makes a vagueness challenge especially difficult to sustain. . . . 'A mind intent upon willful evasion is inconsistent with surprised innocence.'" (quoting *United States v. Ragen*, 314 U.S. 513, 524 (1942))).

The District Court rested its conclusion that the regulation is not unconstitutionally vague on two grounds. First, it reasoned that the sophisticated nature of those required to consult the IEEPA regulations coupled with the availability of guidance from OFAC officials on electronic and telephone hotlines negated any notice concerns. And second, it noted that IEEPA's scienter requirement counseled

55

against a vagueness finding. *See Amirnazmi*, 2009 U.S. Dist. LEXIS 74833, at \*4-8.[34]

As to the latter point, the government had to prove beyond a reasonable doubt that Amirnazmi willfully violated the trade restrictions. *See* 50 U.S.C. § 1705(c) (restricting IEEPA convictions to those who "willfully commit[ ], willfully attempt[ ] to commit, or willfully conspire[ ] to commit" a violation of any license, order or regulation issued pursuant to IEEPA); *see also id.* § 1702(a)(3) ("No person shall be held liable in any court for or with respect to anything done or omitted in good faith in connection with the administration of, or pursuant to and in reliance on, this title, or any regulation, instruction, or direction issued under this title."). As the District Court noted, "this is a case where

---

[34] Without explicitly pronouncing on the constitutionality of the informational-materials exemption, federal courts have uniformly upheld the regulations in the face of vagueness challenges. *See, e.g.*, *United States v. Soussi*, 316 F.3d 1095, 1101-03 (10th Cir. 2002); *United States v. Quinn*, 401 F. Supp. 2d 80, 100 (D.D.C. 2005) ("[T]he Iran trade embargo laws . . . are not apt to sweep within their coverage the everyday acts of average citizens. Rather, they govern the activities of relatively sophisticated individuals who are deliberately engaged in international commerce and, therefore, must be familiar with (if not expert in) various legal regimes . . . in multiple countries."); *Anvari-Hamedani*, 378 F. Supp. 2d at 830-31; *United States v. Lindh*, 212 F. Supp. 2d 541, 573-74 (E.D. Va. 2002); *United States v. Geissler*, 731 F. Supp. 93, 100-01 (E.D.N.Y. 1990).

ignorance of the law *is* a defense; the inability to appreciate the meaning of the law negatives the *mens rea* required for conviction, and Defendant was free to, and did, argue this to the jury." *Amirnazmi*, 2009 U.S. Dist. LEXIS 74833, at *7 (internal quotation marks omitted). The jury unanimously concluded Amirnazmi knew his conduct was unlawful.

And, as to the former point, the record reveals Amirnazmi only halfheartedly availed himself of the opportunity to receive definitive guidance from OFAC. Amirnazmi first contacted OFAC upon his return from Iran on June 3, 2008. He indicated he was curious as to whether consolidating publicly available documents in a single location to increase the ease of access for individuals in Iran would fall within the informational-materials exemption, and he alluded to the possibility of exporting a good to Iran. He did not mention the computations that could be done with the data, nor did he ask if confidential trade secrets were exempt. On June 10, after FBI and IRS officials had executed the search warrant for TranTech, Amirnazmi again contacted the OFAC hotline, this time to complain his office had been searched, but without making any inquiries about the interplay between ChemPlan and the Iranian sanctions. On June 11, he sent a letter to OFAC confirming his unsupported understanding that ChemPlan fell within the exemption but again failed to disclose how ChemPlan functioned as a dynamic planning tool. Amirnazmi once more contacted OFAC on June 17 and was told to submit a "detailed explanation of the transactions he wanted to carry out" if he wanted authoritative guidance. One month later, he was indicted. The District Court concluded Amirnazmi did not

contact OFAC "in good faith or with the intention of actually procuring guidance in complying with the OFAC regulations." *Amirnazmi*, 2009 U.S. Dist. LEXIS 74833, at \*6 n.17. Amirnazmi's refusal to provide OFAC with the detailed information that might have allowed the agency to offer reasoned guidance supports the District Court's conclusion.

Moreover, OFAC's interpretive rulings do not cast doubt on the ability of reasonable persons to appreciate whether their conduct was prohibited. Amirnazmi points to a sequence of rulings in which OFAC attempted to demarcate the scope of permissible editing of Iranian-authored works to be published in the United States. After OFAC ruled on September 30, 2003, that "collaboration on and editing of manuscripts submitted by persons in Iran, including activities such as the reordering of paragraphs or sentences, correction of syntax, grammar, and replacement of inappropriate words by U.S. persons, prior to publication, may result in a substantively altered or enhanced product," it revisited this broad statement after meeting with publishing representatives, concluding on April 2, 2004, that "style and copy editing," such as correcting grammar and spelling and reformatting the document for publication, was exempt activity. On July 19, 2004, OFAC addressed how these prior rulings would apply to U.S. newspapers seeking to publish Iranian-authored articles. It wrote that "substantive edits to the work's content to make the work more cohesive, efficient, argumentative or effective . . . and to make the work conform to the newspaper's editorial standards would not constitute

substantive or artistic alteration or enhancement of the article or commentary."[35]

Although Amirnazmi would read this publishing trilogy as indicating the regulations are so convoluted as to render them incomprehensible even to those charged with administering the sanctions, the salient lesson is that representatives of the publishing entities actually met with OFAC officials to proactively and candidly discuss how the regulations should apply to their line of work.[36] OFAC, for its

---

[35] On the heels of this series of interpretive rulings, OFAC created a general license for transactions "necessary and ordinarily incident to publishing." *See* 69 Fed. Reg. 75468, 75471 (Dec. 17, 2004) (codified at 31 C.F.R. § 560.538).

[36] Amirnazmi fails to grapple with other OFAC rulings that are arguably more germane to ChemPlan's status as informational material. A February 3, 2003, ruling specified that, with respect to the "provision of access to a database, the inclusion of an electric [sic] search function that does no more than search and sort the exempt information in the database is . . . exempt from the prohibitions of the ITR." It further noted that such guidance did "not address any additional product that may be offered in connection with the use of the database; nor does it apply to technical support, customer support, or any other services that might be provided." On December 11, 2003, OFAC distinguished between the provision of basic information and the provision of services "beyond the mere dissemination of information in-being." As explained above in Section IV.A, this line of

part, demonstrated its willingness to partake in productive consultations with businesses that approached it. If Amirnazmi had been perplexed by the applicability of the regulations, he had abundant opportunity to obtain clarification. *See Village of Hoffman Estates*, 455 U.S. at 498 (noting that the ability of sophisticated businesses to obtain clarification "by resort to an administrative process" provides one of the rationales for according economic regulations greater latitude upon a review for vagueness).

In sum, we agree with the District Court's conclusion that, in light of the "narrow subject matter and reach of the IEEPA regulations, as well as the sophisticated nature of the persons they affect and the ability of such persons to obtain guidance from OFAC itself, the IEEPA regulations are not unconstitutionally vague." *Amirnazmi*, 2009 U.S. Dist. LEXIS 74833, at *6.[37] Because OFAC's regulations are

---

demarcation encourages the inference that products falling within this latter category, such as ChemPlan, would fail to find refuge in the exemption.

[37] Amirnazmi's challenge to the constitutionality of the regulations takes the form of a facial challenge. However, the Supreme Court has written that a petitioner "who engages in some conduct that is clearly proscribed cannot complain of the vagueness of the law as applied to the conduct of others. A court should therefore examine the complainant's conduct before analyzing other hypothetical applications of the law." *Village of Hoffman Estates*, 455 U.S. at 495 (footnote omitted). Because Amirnazmi had ample notice that his

neither *ultra vires* nor unconstitutionally vague, we will deny Amirnazmi's request to vacate his IEEPA convictions on these grounds.

## V.

Finally, Amirnazmi's appeal requires us to address two further issues: (1) whether there was a variance between the indictment, which charged Amirnazmi with one continuous conspiracy, and the facts established at trial; and (2) whether the District Court abused its discretion in admitting tape recordings of Amirnazmi's prison telephone calls. We conclude Amirnazmi is not entitled to relief on either of these grounds.

## A.

Amirnazmi contends there was a variance between the indictment and the facts established at trial, and that this variance caused evidence to be admitted that would otherwise have been barred by the statute of limitations.[38] Namely,

---

conduct was captured by the regulations, his facial vagueness challenge, which would be upheld "only if the enactment is impermissibly vague in all of its applications," must fail. *See id.*

[38] We exercise plenary review over claims of variance. *United States v. Daraio*, 445 F.3d 253, 259 (3d Cir. 2006). When, however, the petitioner does not raise a claim in a timely fashion, our review is for plain error. *United States v. Williams*, 464 F.3d 443, 445 (3d Cir. 2006). In the District

Court, Amirnazmi moved for a new trial on the ground that the court erroneously admitted evidence of conduct that fell outside the statute of limitations period on the faulty premise that he had engaged in one continuous course of conduct. On appeal, he has converted this argument into a claim of prejudicial variance. Although both require us to determine whether Amirnazmi's pre-2003 conduct was part of the same continuing course of action that precipitated the 2008 conspiracy charge, the variance claim would allow us to undertake a plenary review of the District Court's decision whereas resubmitting the evidentiary claim would constrain our review by limiting us to the deferential abuse of discretion standard. Whether or not we review Amirnazmi's variance claim *de novo* or for plain error, he must demonstrate that the District Court prejudiced a substantial right. *See United States v. Kemp*, 500 F.3d 257, 287 (3d Cir. 2007) ("A conviction must be vacated when (1) there is a *variance* between the indictment and the proof presented at trial and (2) the variance *prejudices a substantial right of the defendant*.") (internal quotation marks omitted) (emphases added); *Williams*, 464 F.3d at 445 ("Under the *plain error* standard, before an appellate court can correct an error not raised at trial, there must be (1) error, (2) that is plain, and (3) that *affect[s] substantial rights*.") (internal quotation marks omitted) (alteration in original) (emphases added). Because Amirnazmi cannot prove a substantial right was unfairly prejudiced, the dispute over the appropriate standard is immaterial.

Amirnazmi alleges the evidence, "if anything," proved he engaged in two separate conspiracies, one of which terminated before the limitations period. The statute of limitations for violations of IEEPA is five years. *See* 18 U.S.C. § 3282(a) (setting the default statute of limitations for non-capital federal offenses). But, because the District Court concluded Amirnazmi's actions dating back to 1997 were part of a single, continuous conspiracy, it admitted evidence of acts occurring prior to 2003. Amirnazmi contends, as he did in his Rule 33 motion, that the introduction of evidence relating to his activities outside the limitations period tainted his trial.

"There is a variance if the indictment charges a single conspiracy while the evidence presented at trial proves only the existence of multiple conspiracies." *United States v. Kemp*, 500 F.3d 257, 287 (3d Cir. 2007). The rule against variance "protects the defendant's right to an indictment sufficiently inform[ing] [him] of the charges against him so that he may prepare his defense and not be misled or surprised at trial." *United States v. Schurr*, 775 F.2d 549, 553-54 (3d Cir. 1985) (internal quotation marks omitted) (alterations in original). Conspiracy "is a continuing offense and a jury may consider each and all of a defendant's actions in furtherance of the conspiracy so long as the indictment is brought within five years of the last overt act." *United States v. Jake*, 281 F.3d 123, 130 n.6 (3d Cir. 2002). "[T]he crucial question in determining whether the statute of limitations has run is the scope of the conspiratorial agreement, for it is that which determines both the duration of the conspiracy, and whether the act relied on as an overt act may properly be

regarded as in furtherance of the conspiracy." *Grunewald v. United States*, 353 U.S. 391, 397 (1957).

The government's superseding indictment charged Amirnazmi with conspiring to violate IEEPA from 1996 through July 2008 by engaging in transactions with companies located in Iran despite knowing such conduct was prohibited. When the District Court analyzed Amirnazmi's claim within the statute of limitations context, it defined Amirnazmi's conspiracy as a plot "to bring his technical wherewithal, especially the ChemPlan system, back to Iran for the benefit of that country." *Amirnazmi*, 648 F. Supp. 2d at 723. The superseding indictment set forth six pre-2003 overt acts that allegedly contributed to the advancement of this conspiracy, and the court concluded that the evidence adduced by the government at trial demonstrated this conduct was "closely tied" to his "continuing efforts to sell his ChemPlan software to the [NPC]."[39]

---

[39] Specifically, the court cited evidence that Amirnazmi (1) signed a 1997 agreement with NPC to sell the ChemPlan software and traveled to Iran to conduct demonstrations and training; (2) sold NPC a ChemPlan update in 1998; (3) helped secure the BoxScore software for NPC in 2000; (4) met with NPC personnel in Iran in 2000 and subsequently sent NPC officials a fax that included a subscription order form and other ChemPlan materials and which suggested the formation of a joint venture; (5) attended the same conference in 2001 and sent a letter to NPC with an offer for a ChemPlan program that would be designed to meet its ends; (6) sent a

The District Court concluded Amirnazmi had "resolved on achieving certain goals for the betterment of Iran" prior to 2003 and that, although he failed to make significant headway until well later, "there is no evidence that [he] ever abandoned or renounced" the plan he had hatched in the late 1990s. *Id.* After his encounter with President Ahmadinejad in 2006, Amirnazmi's efforts began to bear fruit. He successfully negotiated another licensing agreement with NPC in 2008 (after representing that the 1997 agreement was still valid), and he signed memoranda of understanding with IBACO and NITD. In the court's estimation, Amirnazmi's efforts to sell ChemPlan to NPC were integral to his goal of turning Iran into a "chemical powerhouse." Thus, it concluded, Amirnazmi's pre-2003 acts fell squarely within the scope of his conspiracy to bolster Iran's chemical capacities, and evidence of these acts was properly presented to the jury on the theory that they contributed to a continuing course of conduct. *Id.*

Amirnazmi now offers two alternative arguments: (1) the government failed to prove his pre-2003 conduct was part of any conspiracy, and (2) even if his early sales to the NPC were part of a conspiracy to violate IEEPA, that purported

---

second letter discussing the 2001 conference and urging NPC to contact him with respect to the proposed joint venture; and (7) attempted to drum up business in 2002 with his unsuccessful attempt to have brochures printed in Iran for his software. *Amirnazmi*, 648 F. Supp. 2d at 722.

conspiracy terminated "well before the subsequent 2008 sale of ChemPlan."

The gravamen of Amirnazmi's contention that his pre-2003 conduct was not conspiratorial in any way is that the government failed to demonstrate the existence of an agreement to violate the statute. *See United States v. Gebbie*, 294 F.3d 540, 544 (3d Cir. 2002) (listing "an agreement between two or more persons" as an essential element of a conspiracy charge under 18 U.S.C. § 371). Amirnazmi claims the government failed to demonstrate he shared a common enterprise with NPC "beyond occasionally buying and selling computer software." He attempts to divorce his pre-2003 acts from the overriding contextual narrative and style them as intermittent transactions between a buyer and a seller working at arms' length and without any nefarious joint objective. However, Amirnazmi declines to confront the evidence that demonstrates he worked in conjunction with various officials to provide ChemPlan and BoxScore and had ongoing, regular contact with assorted NPC agents. The jury may reasonably infer these business relationships would not have persisted without at least an understanding in place between the parties that Amirnazmi would be willing to provide goods and services in violation of the embargo. *See United States v. McGlory*, 968 F.2d 309, 326 (3d Cir. 1992) (concluding that a reasonable jury could infer from the totality of the evidence "that the activities of the participants . . . could not have been carried on except as the result of a preconceived scheme or common understanding" (internal quotation marks omitted) (alteration in original)).

And Amirnazmi's alternative contention—that, at best, the government proved the existence of two separate conspiracies—is similarly unpersuasive. It miscasts his unrequited efforts to spark renewed interest in ChemPlan prior to 2006 as evidence the conspiracy could not have been "continuing." This slackening may reveal a disparity in the vigor with which each side pursued the object of the conspiracy; NPC seems to have been a somewhat reluctant collaborator for most of the early part of the past decade. Nevertheless, the resumption of concerted activity in 2007 came on the heels of Amirnazmi's continuous efforts to preserve and strengthen TranTech's Iranian ties. The temporary lull in sales does not detract from the District Court's conclusion that Amirnazmi's later actions were part of the same conspiracy that had begun in the 1990s. Amirnazmi's recurrent efforts to strengthen the relationship were sandwiched between two periods of concerted activity in which the parties pursued the same unlawful end. The unaltered nature of the parties' interests both prior to and after 2003 belies Amirnazmi's depiction of the facts as evidencing one conspiracy ceasing and another commencing.

Amirnazmi would have to demonstrate that, even if a variance led to evidence being admitted that otherwise would have been barred by the statute of limitations, such evidence prejudiced a substantial right. As noted, this holds true whether we conduct a plenary review or review for plain error. "An error affects substantial rights when it is prejudicial: It must have affected the outcome of the district court proceedings." *United States v. Vazquez-Lebron*, 582 F.3d 443, 446 (3d Cir. 2009) (internal quotation marks

omitted). Here, it appears as though Amirnazmi's variance argument is targeted primarily, if not exclusively, at his conviction for conspiracy in Count One. Because limiting the jury's consideration to evidence of Amirnazmi's post-2006 activities would not have resulted in a different outcome, Amirnazmi cannot demonstrate his substantial rights were prejudiced by introduction of this evidence.

Because the District Court neither misinterpreted the law of conspiracy nor prejudiced a substantial right of Amirnazmi's, it did not err in admitting evidence of Amirnazmi's pre-2003 conduct.

## B.

Lastly, Amirnazmi appeals the District Court's decision to allow the government to introduce into evidence tape recordings and translated transcripts of telephone calls placed by Amirnazmi to certain family members during his pretrial imprisonment at the Federal Detention Center (FDC).[40] Amirnazmi argues the government violated Fed. R.

---

[40] We review a district court's decision to admit or exclude evidence, "if premised on a permissible view of the law," for an abuse of discretion. *United States v. Sokolow*, 91 F.3d 396, 402 (3d Cir. 1996). Amirnazmi initially challenged the tape recordings under the Wiretap Act, 18 U.S.C. § 2510 *et seq*. The District Court rejected this argument in its Feb. 6, 2009 Order admitting the tapes, and Amirnazmi declined to renew this objection in either his Rule 33 motion or in the briefing materials he has submitted in support of his current appeal.

Crim. P. 17(c) by impermissibly using subpoenas as discovery devices. Rule 17(c), which governs the issuance of subpoenas *duces tecum* in federal criminal proceedings, is "not intended to provide a means of discovery for criminal cases." *United States v. Nixon*, 418 U.S. 683, 698 (1974), *superseded by statute on other grounds as stated in Bourjaily v. United States*, 483 U.S. 171, 177-79 (1987); *see also United States v. Cuthbertson*, 630 F.2d 139, 144 (3d Cir. 1980). Rather, the rule was designed "to expedite [a] trial by providing a time and place *before* trial for the inspection of the subpoenaed materials." *Bowman Dairy Co. v. United States*, 341 U.S. 214, 220 (1951). Notably, the Rule 17(c) test outlined in *Nixon* pertains to the production of documents in advance of trial. 418 U.S. at 698-700.

Here, the government served a series of trial subpoenas on the FDC's Custodian of Records requiring him to appear on a specified date and to bring with him copies of Amirnazmi's telephonic communications aside from those shielded by attorney-client privilege. Critically, the dates returnable of the subpoenas paralleled the then-scheduled trial dates and noted that the witness was "subject to call." Because the subpoenas did not require pre-trial production, the District Court concluded *Nixon* was not controlling and the government had not run afoul of Rule 17(c). Amirnazmi, however, argues the government implicitly understood that the FDC would expedite its production of the requested evidence. That is, based on the alacrity with which the FDC habitually responds to subpoenas received from the United States Attorney's Office, Amirnazmi believes the government anticipated the FDC turning around the subpoenas in short

order and consequently having access to the communications well in advance of trial. Thus, he argues the protections embodied in *Nixon* against the misuse of pre-trial subpoenas should apply notwithstanding the formal returnable dates on the subpoenas.

Although the District Court rejected Amirnazmi's invitation to adopt a broad reading of Rule 17(c) both at the suppression hearing and in its denial of his Rule 33 motion, Amirnazmi again seeks a ruling that *Nixon's* gloss on Rule 17(c) applies with equal force to trial subpoenas likely to yield pre-trial production. Amirnazmi discerns support in *United States v. Noriega*, 764 F. Supp. 1480, 1494 (S.D. Fla. 1991), for the broad proposition that trial subpoenas may not be used to procure advance production of a defendant's prison-recorded conversations without first obtaining leave of court. Significantly, in *Noriega*, the subpoenas directed the custodian of records to appear and testify on various dates, none of which corresponded with scheduled hearings in the case. *Id.* at 1482. Because no proceedings were scheduled on the dates indicated in the subpoenas, the court found it unmistakable that the subpoenas "constituted a broad dragnet" designed to "enable the prosecution to examine these recordings prior to trial in order to obtain additional discovery against the defendant." *Id.* at 1492-93. Additionally, the court noted that subpoenas are more likely to be used for impermissible discovery purposes "when advance production of materials is sought instead of the usual production at time of trial or other proceeding in which they are to be used in evidence." *Id.* at 1493.

Here, the government issued subpoenas that complied with the facial requirements of trial subpoenas. On other facts, such formalistic compliance may be insufficient to mask the government's efforts to make an end run around *Nixon*. However, the record before us does not demonstrate such an impermissible discovery motive. We therefore conclude that the District Court did not abuse its discretion in admitting the recordings as evidence.[41]

---

[41] Furthermore, Amirnazmi claims the trial was tainted by the admission of these telephone recordings but does not explain how the result would have been different were they to have been excluded. As the District Court astutely noted,

> The probative value of these tape recordings lies in their value as evidence of Defendant's state of mind. Yet, the jury was presented with a plethora of other evidence from which Defendant's state of mind could be determined, including Defendant's repeated contradictory statements about his business dealings in Iran, and the multiple times he was put on notice of the restrictions on trade with Iran. Therefore, even assuming the Court erred in admitting these tape recordings, such error would not have had a substantial impact on the verdict and would not warrant a new trial.

648 F. Supp. 2d at 720 n.18.

## VI.

For the foregoing reasons, we will affirm the jury's verdict and the District Court's imposition of a four-year prison sentence.