**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**April 15, 2015**

**Elisabeth A. Shumaker**
**Clerk of Court**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

UNITED STATES OF AMERICA,

    Plaintiff - Appellee,

v.

LESTER RAY NICHOLS,

    Defendant - Appellant.

No. 14-3041

_____

**ORDER**
_____

Before **BRISCOE**, Chief Judge, **KELLY**, **LUCERO**, **HARTZ**, **TYMKOVICH**, **GORSUCH**, **HOLMES**, **MATHESON**, **BACHARACH**, **PHILLIPS**, **MCHUGH**, and **MORITZ**, Circuit Judges.
_____

This matter is before the court on the appellant's *Petition for Rehearing En Banc*. We also have a response from the government. Upon consideration of the implicit request for panel rehearing contained in the petition, the request is denied by a majority of the original panel members.

The en banc petition was also transmitted to all of the judges of the court who are in regular active service. Upon review, a poll was called, and a majority of the active judges voted to deny the en banc suggestion. Consequently, that request is likewise denied. Judges Lucero, Gorsuch, Matheson and Moritz would grant the en banc petition.

Judges Lucero and Gorsuch have written separately in dissent from the denial of the petition.

Entered for the Court

ELISABETH A. SHUMAKER, Clerk

**14-3041, United States v. Nichols (Lucero, J., dissenting from the denial of rehearing en banc)**

I dissent from the denial of rehearing en banc because a recent Eighth Circuit decision creates a circuit split regarding the applicability of SORNA's notice provisions to offenders who leave the country. Compare United States v. Lunsford, 725 F.3d 859, 860 (8th Cir. 2013), with United States v. Murphy, 664 F.3d 798, 799 (10th Cir. 2011). I continue to hold the view that Murphy was incorrectly decided for the reasons stated in my dissent from that case. See id. at 804-08 (Lucero, J., dissenting). Correcting this circuit split is a matter of exceptional importance given the express purpose of Congress in enacting SORNA to remedy "a wide disparity among State registration requirements and notification obligations for sex offenders." H.R. Rep. No. 109-218(I), at 23 (2005).

The facts of Lunsford and this case illustrate why our current jurisprudence runs directly against the stated intent of Congress. In both cases, the appellants moved directly from the Kansas City metropolitan area to the Philippines. Lunsford had lived in the Missouri side of the metropolis and was not required to update his Missouri registration to reflect his move out of the country. Lunsford, 725 F.3d at 860. But Nichols, who had lived just across the river in Kansas, was brought back to the United States and sentenced to prison for failing to update his Kansas registration. United States v. Nichols, 775 F.3d 1225, 1227 (10th Cir. 2014). We have simply replaced a "wide disparity among State registration requirements" with a wide disparity among Circuit registration requirements. In doing so, we thwart the intent of Congress and needlessly complicate an already complicated law.

Additionally, I agree with Judge Gorsuch that the Constitution demands something more than an "intelligible principle" when Congress delegates its power to define crimes to the executive branch agency charged with prosecuting those crimes. Moreover, I agree that it is questionable whether SORNA even includes an "intelligible principle" to guide the Attorney General's discretion to apply SORNA's provisions to pre-Act offenders. I would address this issue in en banc rehearing as well.

No. 14-3041, *United States v. Nichols*

**GORSUCH**, Circuit Judge, dissenting from the denial of rehearing en banc.

A circuit split lingers here. First to approach the question, this circuit interpreted 42 U.S.C. § 16913 as requiring sex offenders to notify authorities if they plan to leave the country. *United States v. Murphy*, 664 F.3d 798, 801-02 (10th Cir. 2011). In a later opinion the Eighth Circuit gave thoughtful consideration to this interpretation of the statute but came to the opposite view. *United States v. Lunsford*, 725 F.3d 859, 861-82 (8th Cir. 2013); *see also Murphy*, 664 F.3d at 805 (Lucero, J., dissenting). In denying rehearing today to reconsider this court's position in light of *Lunsford*'s learning, we leave those who seek a resolution of the circuit split to travel other avenues. *Murph*y and *Lunsford* articulate both sides of the split admirably and there's no need for further amplification here, only resolution somewhere.

Beyond this matter of statutory interpretation, though, lies a constitutional question that deserves more notice. If the separation of powers means anything, it must mean that the prosecutor isn't allowed to define the crimes he gets to enforce. Yet, that's precisely the arrangement the Sex Offender Registration and Notification Act purports to allow in this case and a great many more like it. In § 16913(d), Congress left it to the Attorney General to decide whether and on what terms sex offenders convicted before the date of SORNA's enactment should be required to register their location or face another criminal conviction. So unusual is this delegation of legislative authority that to find an analogue you

might have to look back to the time Congress asked the President to devise a code of "fair competition" for the poultry business — a delegation of legislative authority the Supreme Court unanimously rejected and Justice Cardozo called "unconfined and vagrant," a "delegation running riot." *A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495, 551, 553 (1935) (Cardozo, J., concurring). Even then you could be excused for thinking the delegation before us a good deal less cooped or caged than that one. After all, it doesn't just grant some alphabet soup agency the power to write rules about the chicken trade. It invests in the nation's chief prosecutor the authority to devise a criminal code governing a half-million people.

When it comes to sex offenders convicted *after* SORNA's enactment, the statute is exquisitely detailed. It divides those persons into three tiers based on the seriousness of their offense. 42 U.S.C. § 16911. It specifies which sex offenses place offenders in which tiers. *Id.* It requires tier I offenders to register their location for 15 years; tier II offenders to do so for 25 years; and tier III offenders to carry on registering for life. *Id.* § 16915. It explains what conditions merit reducing the registration period. *Id.* § 16915(b)(1). On and on it goes for 22 pages.

But none of this automatically applies to Mr. Lester Nichols and others convicted of sex offenses *before* the Act's passage. Instead, when it comes to past offenders, the Act says just this:

2

> The Attorney General shall have the authority to specify the applicability of the requirements of this subchapter to sex offenders convicted before the enactment of this chapter . . . and to prescribe rules for registration of any such sex offender. 42 U.S.C. § 16913(d).

Yes, that's it.

As the government acknowledges, this language leaves the Attorney General free to do nothing: the law "does not require the Attorney General to act within a certain time frame or by a date certain; it does not require him to act at all." Brief for the United States at 23-24, *Reynolds v. United States*, 132 S. Ct. 975 (2012) (No. 10-6549). Alternatively, "[u]nder his delegated authority in Subsection (d), the Attorney General could" require all past offenders to register or "require some but not all to register." *Id.* at 24-25. Or, alternatively still, he could require those forced to register to "comply with some but not all of the registration requirements" applicable to future offenders in order to adapt the law as he thinks best for past offenders. *Id.* After all, the statute grants the Attorney General authority to specify the applicability not of the Act as a whole, one way or another, but to specify the applicability of each of the various "requirements" contained within the Act — and Congress well knew the difference. *Compare* 42 U.S.C. § 16912(b) (explaining that the Attorney General shall "interpret and implement this subchapter"), *with id.* § 16913(d) (providing the Attorney General authority "to specify the applicability of the requirements of this subchapter"). Even then, the Attorney General remains free to "change his mind at any given

time or over the course of different administrations."  Brief for the United States, *supra*, at 23-24.  Given all this, it's perhaps unsurprising how many circuits and commentators have observed that the degree of discretion invested in the Attorney General here is vast.[1]  It is so vast, in fact, that some (including the government itself) once suggested a narrower interpretation of § 16913(d) would make more sense of the statute.  *See id.*; *Reynolds*, 132 S. Ct. at 986 (Scalia, J., dissenting).

A majority of the Supreme Court, however, carefully considered and rejected any alternative reading and made plain that, as a matter of statutory interpretation, SORNA's retroactive application hinges on the Attorney General. The Court explained that Congress chose this course as its solution for the many "problems" associated with trying "to apply [SORNA's] registration requirements to pre-Act offenders" who were at the time subject to a "patchwork of pre-existing state systems."  *Reynolds*, 132 S. Ct. at 981.  The power delegated to the

---

[1] *See, e.g.*, *United States v. Rickett*, 535 F. App'x 668, 673 (10th Cir. 2013) ("As written, § 16913(d) gives the Attorney General discretion to decide whether and how SORNA should be applied retroactively."); *United States v. DeJarnette*, 741 F.3d 971, 981 (9th Cir. 2013) ("[W]e see no reason to assume that the Attorney General was mandated to apply *all* of SORNA's registration requirements to *all* pre-Act offenders."); *United States v. Johnson*, 632 F.3d 912, 923 (5th Cir. 2011) ("This language is not ambiguous.  Following the plain meaning rule, this phrase delegates to the Attorney General the decision of whether and how the SORNA registration requirements apply to offenders with pre-enactment convictions."); *United States v. Madera*, 528 F.3d 852, 858 (11th Cir. 2008) ("Subsection (d) . . . granted the Attorney General unfettered discretion to determine both *how* and *whether* SORNA was to be retroactively applied."); *see also* Steven G. Calabresi & Gary Lawson, *The Rule of Law as a Law of Law*, 90 Notre Dame L. Rev. 483, 485 (2014); Reem Sadik, Comment, *Passing the Torch but Sailing too Close to the Wind*, 6 Legis. & Pol'y Brief 295, 298 (2014).

4

Attorney General, the Court said, is sort of like a directive telling the Commissioner of Major League Baseball that he has "the authority to specify the applicability" of a stringent minor league drug testing policy to major league players: "we should think that the minor league policy would not apply unless and until the Commissioner so specified" whether and how it should be applied to meet the needs of a similar but different league. *Id.* As written, the statute demonstrates Congress thought that past offenders could "warrant[] different federal registration treatment" than future offenders. *Id.* Even among pre-Act offenders, the statute contemplates the possibility of "different federal registration treatment of different categories of pre-Act offenders." *Id.* In short, Congress thought it a "desirable solution" to ask "the Department of Justice . . . to examine these pre-Act offender problems" and specify "new registration requirements" for them. *Id.*

The Court acknowledged that a statute investing so much authority in the Attorney General inevitably raises with it separation of powers questions. But, the Court said, it would leave those questions for another day. *Id*. Justices Scalia and Ginsburg went further, expressing concern that the law "sail[s] close to the wind." *Id.* at 986 (Scalia, J., dissenting). The day to decide the constitutional question the Court left open is now upon us. And, as it turns out, the statute doesn't just sail close to the wind. It sails right into it.

5

\*

Article I § 1 provides that "[a]ll legislative powers herein granted shall be vested in a Congress of the United States." U.S. Const. art. I, § 1. Many times over and in cases stretching back to the founding the Supreme Court has held that this language limits the ability of Congress to delegate its legislative power to the Executive. *See Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457 (2001). There's ample evidence, too, that the framers of the Constitution thought the compartmentalization of legislative power not just a tool of good government or necessary to protect the authority of Congress from encroachment by the Executive but essential to the preservation of the people's liberty. As Madison put it, "[n]o political truth is . . . stamped with the authority of more enlightened patrons of liberty" than the separation of powers because "[t]he accumulation of all powers, legislative, executive, and judiciary in the same hands . . . may justly be pronounced the very definition of tyranny." The Federalist No. 47, at 298 (James Madison) (Clinton Rossiter ed., 1961). By separating the lawmaking and law enforcement functions, the framers sought to thwart the ability of an individual or group to exercise arbitrary or absolute power. And by restricting lawmaking to one branch and forcing any legislation to endure bicameralism and presentment, the framers sought to make the task of lawmaking more arduous still. These structural impediments to lawmaking were no bugs in the system but the point of the design: a deliberate and jealous effort to preserve room for

6

individual liberty.  *See, e.g.*, *Dep't of Transp. v. Ass'n of Am. Railroads*, 135 S. Ct. 1225, 1237 (2015) (Alito, J., concurring) ("The principle that Congress cannot delegate away its vested power exists to protect liberty.").

Without a doubt, the framers' concerns about the delegation of legislative power had a great deal to do with the criminal law.  The framers worried that placing the power to legislate, prosecute, and jail in the hands of the Executive would invite the sort of tyranny they experienced at the hands of a whimsical king.  Their endorsement of the separation of powers was predicated on the view that "[t]he inefficiency associated with [it] serves a valuable" liberty-preserving "function, and, in the context of criminal law, no other mechanism provides a substitute."  Rachel E. Barkow, *Separation of Powers and the Criminal Law*, 58 Stan. L. Rev. 989, 1011-17, 1031 (2006).

So it is that "to abandon openly the nondelegation doctrine [would be] to abandon openly a substantial portion of the foundation of American representative government."  Gary Lawson, *Delegation and Original Meaning*, 88 Va. L. Rev. 327, 332 (2002).  Neither is it so much that bureaucrats might do a "bad job as our effective legislators" as that "they are neither elected nor reelected, and are controlled only spasmodically by officials who are."  John Hart Ely, *Democracy and Distrust* 131 (1980).[2]

---

[2]  For other excellent works along these and related lines, see Philip Hamburger, *Is Administrative Law Unlawful?* 377 (2014); Bogdan Iancu, *Legislative Delegation:  The Erosion of Normative Limits in Modern*

Of course all this invites the question: how do you know an impermissible delegation of legislative authority when you see it? By its own telling, the Court has had a hard time devising a satisfying answer. *See, e.g.*, *Wayman v. Southard*, 23 U.S. (10 Wheat) 1, 42 (1825) ("[T]he precise boundary of this power is a subject of delicate and difficult inquiry. . . ."). But the difficulty of the inquiry doesn't mean it isn't worth the effort. After all, at stake here isn't just the balance of power between the political branches who might be assumed capable of fighting it out among themselves. At stake is the principle that the scope of individual liberty may be reduced only according to the deliberately difficult processes prescribed by the Constitution, a principle that may not be fully vindicated without the intervention of the courts. And "[a]bdication of responsibility is not part of the constitutional design." *Clinton v. City of New York*, 524 U.S. 417, 452 (1998) (Kennedy, J., concurring).[3]

---

*Constitutionalism* 222 (2012); Martin Redish, *The Constitution as Political Structure* 16 (1995); David Schoenbrod, *Power Without Responsibility* 181 (1993); Ernest Gellhorn, *Returning to First Principles*, 36 Am. U. L. Rev. 345, 352 (1987); Paul Gewirtz, *The Courts, Congress, and Executive Policy-Making: Notes on Three Doctrines*, 40 Law & Contemp. Probs. 46, 49-65 (1976); Marci A. Hamilton, *Representation and Nondelegation: Back to Basics*, 20 Cardozo L. Rev. 807, 822 (1999); Carl McGowan, *Congress, Court, and Control of Delegated Power*, 77 Colum. L. Rev. 1119, 1127-30 (1977); Bernard Schwartz, *Of Administrators and Philosopher-Kings: The Republic, The Laws, and Delegations of Power*, 72 Nw. U. L. Rev. 443, 457 (1978); Nadine Strossen, *Delegation as a Threat to Liberty*, 20 Cardozo L. Rev. 861, 861 (1999).

[3] *See also, e.g.*, *Ass'n of Am. Railroads*, 135 S. Ct. at 1237 (Alito, J., concurring) ("[T]he inherent difficulty of line-drawing is no excuse for not enforcing the Constitution."); *id.* at 1246 (Thomas, J., concurring in the

Besides, putting the pieces together it turns out we do know a few things.

We know, for example, that Congress can leave "details" to the Executive. Congress can't punt to the President the job of devising a competition code for the chicken industry. *Schechter Poultry*, 295 U.S. at 531. Such widely applicable rules governing private conduct must be enacted by the Legislature. But once Congress enacts a detailed statutory scheme on its own — once it says, for example, that margarine manufacturers must pay a tax and place a stamp on their packages showing the tax has been paid — Congress may leave to the President "details" like designing an appropriate tax stamp. *In re Kollock*, 165 U.S. 526, 533 (1897); *see also, e.g.*, *Currin v. Wallace*, 306 U.S. 1, 15 (1939); *United States v. Shreveport Grain & Elevator Co.*, 287 U.S. 77, 85 (1932).

Of course, defining what qualifies as a detail is itself no detail. But whether or not something fairly denominated a detail is involved, we also know Congress may pass legislation the operation of which is conditioned on a factual finding by the President. So, for example, Congress may direct the President to lift a statutorily imposed trade embargo against Great Britain if he determines as a

---

judgment) (explaining that enforcing the separation of powers "is no less important for its difficulty"); Louis L. Jaffe, *An Essay on Delegation of Legislative Power*, 47 Colum. L. Rev. 561, 577 (1947) ("[N]early every doctrine of constitutional limitation has been attacked as vague. Essentially the charges go to the institution of judicial review as we have it rather than specifically to the delegation doctrine."); Antonin Scalia, *A Note on the Benzene Case*, Reg., July-Aug. 1980, at 25, 28 ("So even with all its Frankenstein-like warts, knobs, and (concededly) dangers, the unconstitutional delegation doctrine is worth hewing from the ice.").

factual matter that it is no longer violating the United States's neutrality. *See*

*Cargo of the Brig Aurora v. United States*, 11 U.S. 382, 388 (1813); *see also, e.g.*,

*Marshall Field & Co. v. Clark*, 143 U.S. 649, 692-93 (1892). That's clearly no

trivial question the President may answer. But answer it he may so long as a

clear legislative consequence follows from his factual finding.

While these are the most traditional delegation tests — is it a detail? do we

have a clear legislative consequence hinging on a factual finding? — in more

recent times the Court has gone further, allowing legislation to stand so long as it

contains an "intelligible principle" to guide the exercise of Executive discretion.

*J.W. Hampton, Jr. & Co. v. United States*, 276 U.S. 394, 409 (1928). How

intelligible the "intelligible principle" must be to pass muster is much debated.[4]

But we know, by way of example, that Congress may ask the EPA to set national

air quality standards which are "requisite to protect the public health" subject to

"an adequate margin of safety" because, as used in the statute, the term

"requisite" demands a standard neither higher nor lower than necessary to meet

---

[4] *See, e.g.*, *Ass'n of Am. Railroads*, 135 S. Ct. at 1246 (Thomas, J., concurring in the judgment); *Mistretta v. United States*, 488 U.S. 361, 415-17 (1989) (Scalia, J., dissenting); David Schoenbrod, *The Delegation Doctrine: Could the Court Give It Substance?*, 83 Mich. L. Rev. 1223, 1224 (1985) ("Since the early part of this century, the Court has said in essence that a statute may be vague so long as it is either not too vague or no vaguer than necessary."); Lawson, *supra*, at 329 (asserting that the Court has "found intelligible principles where less discerning readers find gibberish"); *see also supra* n.2 (additional authorities discussing this question).

the legislatively directed objective of protecting the public health with an adequate margin of safety. *Whitman*, 531 U.S. at 473, 476.

Still, the Court has never expressly held that an intelligible principle alone suffices to save a putative delegation when the criminal law is involved. *See Touby*, 500 U.S. at 165-66. To be sure, the Court has applied the intelligible principle test to regulations that may be enforceable through criminal penalties. *See, e.g., United States v. O'Hagan*, 521 U.S. 642, 695 n.10 (1997); *Yakus v. United States*, 321 U.S. 421, 424-25 (1944). But the Court hasn't endorsed the test in anything like the situation we face — legislation leaving it to the nation's top prosecutor to specify whether and how a federal criminal law should be applied to a class of a half-million individuals. In fact, the Court has repeatedly and long suggested that in the criminal context Congress must provide more "meaningful[]" guidance than an "intelligible principle." *Touby*, 500 U.S. at 166; *Fahey v. Mallonee*, 332 U.S. 245, 249-50 (1947); *see also, e.g., United States v. Robel*, 389 U.S. 258, 272-73 (1967) (Brennan, J., concurring); *Barenblatt v. United States*, 360 U.S. 109, 140 n.7 (1959) (Black, J., dissenting); *cf. United States v. Grimaud*, 220 U.S. 506, 517 (1911); *United States v. Eaton*, 144 U.S. 677, 687-88 (1892).

It's easy enough to see why a stricter rule would apply in the criminal arena. The criminal conviction and sentence represent the ultimate intrusions on personal liberty and carry with them the stigma of the community's collective

11

condemnation — something quite different than holding someone liable for a money judgment because he turns out to be the lowest cost avoider. *See, e.g.*, Henry M. Hart, Jr., *The Aims of the Criminal Law*, 23 Law & Contemp. Prob. 401, 404 (1958); William J. Stuntz, *Substance, Process, and the Civil-Criminal Line*, 7 J. Contemp. Legal Issues 1, 26 (1996). Indeed, the law routinely demands clearer legislative direction in the criminal context than it does in the civil and it would hardly be odd to think it might do the same here. *See, e.g.*, *Whitman v. United States*, 135 S. Ct. 352, 353 (2014) (Scalia, J., statement respecting the denial of certiorari). When it comes to legislative delegations we've seen, too, that the framers' attention to the separation of powers was driven by a particular concern about individual liberty and even more especially by a fear of endowing one set of hands with the power to create and enforce criminal sanctions. And might not that concern take on special prominence today, in an age when federal law contains so many crimes — and so many created by executive regulation — that scholars no longer try to keep count and actually debate their number? *See* John C. Coffee, Jr., *Does "Unlawful" Mean "Criminal"?: Reflections on the Disappearing Tort/Crime Distinction in American Law*, 71 B.U. L. Rev. 193, 216 (1991) (estimating that over 300,000 federal criminal regulations are on the books).

Recently, the Supreme Court has suggested what a more "meaningful" standard might look like in the criminal context. *See Touby*, 500 U.S. at 166-67.

Its discussion came in the course of a challenge to the Controlled Substances Act — legislation permitting the Attorney General to schedule various drugs as controlled substances, rendering their possession by unauthorized persons illegal. The Court allowed the law to stand, but instead of applying the intelligible principle test alone it proceeded to stress the presence and importance of certain specific statutory features. First, the Court explained, to schedule a drug as a controlled substance the Executive had to find that the drug posed an "imminent hazard" to public safety. *Id.* at 166. Second, when making that determination, the Court noted, the Executive had to consider the drug's "history and current pattern of abuse," "[t]he scope, duration, and significance of abuse," and "[w]hat, if any, risk there is to the public health." *Id.* Third, the law required a further factual finding that the drug in question "has a high potential for abuse," "has no currently accepted medical use in treatment in the United States," and "[t]here is a lack of accepted safety for use of the drug . . . under medical supervision." *Id.* at 167.

Here we see strains of a more traditional delegation jurisprudence, one permitting Congress to enact rules the operation of which is premised on the Executive's factual findings. Indeed, distilling *Touby* to its essence, at least three "meaningful" limitations emerge: (1) Congress must set forth a clear and generally applicable rule (unauthorized persons may not possess the drug) that (2) hinges on a factual determination by the Executive (does the drug pose an

13

imminent hazard?) and (3) the statute provides criteria the Executive must employ when making its finding (does the drug in question currently have an accepted medical use?). These three criteria could easily be applied to most any delegation challenge in the criminal context and provide the more meaningful standard the Court has long sought. In fact, since *Touby* a number of courts of appeals have employed something very much like them when assessing delegation challenges to federal criminal statutes. *See United States v. Amirnazmi*, 645 F.3d 564, 576-77 (3d Cir. 2011); *United States v. Dhafir*, 461 F.3d 211, 216-17 (2d Cir. 2006); *United States v. Arch Trading Co.*, 987 F.2d 1087, 1093-94 (4th Cir. 1993).

\*

With that much guidance about delegation doctrine in hand, a few things come clear when we return to the statute before us. For one, it's easy enough to see the similarities between our case and *Schechter Poultry* where the Court held Article I violated. Here as there Congress pointed to a problem that needed fixing and more or less told the Executive to go forth and figure it out. Meanwhile, it's hard to see how ours might be likened to any of the cases turning away delegation challenges.

True, some might try to pass off the question of SORNA's applicability to past offenders as a mere "detail." But the statute before us leaves the Attorney General with "unfettered discretion to determine both *how* and *whether* SORNA [is] to be retroactively applied" to a half-million individuals under threat of

14

criminal prosecution from his own deputies. *Madera*, 528 F.3d at 858. And however far you want to bend the boundaries of what qualifies as a "detail" it's hard to see how that might qualify. Our case just isn't anything like your grandfather's tax stamp challenge.

Fair enough, some might respond, but sex offenders are so unpopular that there's little chance an Attorney General would do anything other than apply SORNA retroactively to the fullest extent possible. Maybe there is no legislative mandate — conditional or otherwise — requiring him to follow this course, but there might as well be. A reply along these lines seems a likely enough answer to the question what a politically attuned Attorney General would do when the hot potato is passed his way. But it also seems an unlikely answer to the question whether Congress may constitutionally pass the potato in the first place. After all, in a delegation challenge the question isn't whether the Executive is likely to exercise the delegation in one way or another but whether Congress is empowered to delegate the decision at all. *See Whitman*, 531 U.S. at 472-73 ("The very choice of which portion of the power to exercise . . . would *itself* be an exercise of the forbidden legislative authority."). Indeed, the logic at play here would serve to ensconce even the most extreme and obviously unconstitutional delegations only because of a judicial intuition about contemporary political pressures. And not only do unelected judges make for notoriously poor political

15

pundits: ours is supposed to be an independent judiciary making decisions on the legal merits without respect to the vagaries of shifting political winds.

Others still might claim an "intelligible principle" can be rummaged out of SORNA's preamble — a provision that expresses Congress's wish to "protect the public from sex offenders and offenders against children" by establishing "a comprehensive national system for the registration of those offenders." 42 U.S.C. § 16901. But Supreme Court cases rejecting delegation challenges on intelligible principle grounds don't usually rest on policy objectives voiced in a statute's preamble. *See, e.g.*, *Panama Refining Co. v. Ryan*, 293 U.S. 388, 417-19 (1935) (finding a statute's general policy statement insufficient because the "general outline of policy contains nothing as to the circumstances or conditions in which" the delegation should be exercised, *id.* at 417). To be sure, the Court has sometimes gone so far as to suggest that Congress need only "clearly delineate[] the general policy" to guide an agency's conduct. *Mistretta*, 488 U.S. at 372-73. But this language usually seems to cover situations in which the legislative grant of discretion is tied to specific statutory provisions that expressly direct the exercise of that discretion. *See, e.g.*, *id.* at 375-76 (containing a direct link between discretion and direction); *Yakus*, 321 U.S. at 420-21 (same). Even in *National Broadcasting Co. v. United States*, 319 U.S. 190 (1943), perhaps one of the most ambitious uses of the intelligible principle test, the Court interpreted the statute granting the Executive discretion to regulate radio in the "public interest"

16

as requiring him to exercise that discretion in ways that "encourage the larger and more effective use of radio." *Id.* at 216. Meanwhile, no comparable guidance exists here for § 16913(d) "specifie[s] no governing standard whatsoever." Calabresi & Lawson, *supra* n.1, at 485.

Requiring a direct statutory link between discretion and direction makes sense too. After all, as the Court has acknowledged in recent years, it is most assuredly wrong to assume that "whatever" seems to further a "statute's primary objective must be the law." *Rodriguez v. United States*, 480 U.S. 522, 526 (1987) (emphasis omitted). Legislation is the art of compromise and few (if any) statutes pursue a single preambulatory purpose without condition, subtlety, or exception. *Id.* at 525-26; *see also United States v. Rentz*, 777 F.3d 1105, 1113 (10th Cir. 2015) (en banc); John F. Manning, *What Divides Textualists from Purposivists?*, 106 Colum. L. Rev. 70, 104 (2006). For precisely these reasons, when it comes to the business of statutory interpretation it is usually the more specific and not the more general or aspirational direction that controls. *See, e.g.*, *Radzanower v. Touche Ross & Co.*, 426 U.S. 148, 153 (1976).

Our case illustrates the point. SORNA's prefatory provision expressing the desire to protect children and create a nationwide registration requirement hardly establishes that the statute meant to do so always and in every particular without exception or at any cost. In fact, SORNA is replete with examples of compromise even when it comes to future offenders. Congress indicated that some future

17

offenders may be exempt from its registration requirements if they committed certain kinds of sex offenses but not others. 42 U.S.C. § 16911(5)(C), (7)(A), (7)(B), (8). Registration is required for life for some offenders but lesser periods for others. *Id.* § 16915(a). These periods can be reduced on good behavior. *Id.* § 16915(b)(1). In these circumstances, it would seem strange to suppose that the statute's prefatory statement of purpose — or, for that matter, provisions of the law discussing the treatment of future offenders — provides intelligible guidance for the Attorney General's treatment of past offenders. Especially when Congress went on to address past offenders specifically, exempted them from the automatic application of any of the statute's registration requirements, and left their treatment to the Attorney General.

Separately but relatedly, the Supreme Court has instructed that under the intelligible principle test "the degree of agency discretion that is acceptable varies according to the scope of the power congressionally conferred." *Whitman*, 531 U.S. at 475. Faint echos of detail doctrine can be found here: less direction may be required when Congress leaves it to the Executive to define what constitutes a "country elevator[]" and more may be required when Congress seeks to endow the Executive with the power to create regulations that affect the national economy. *Id*. So even assuming that a preamble detached from the provision granting discretion to the Executive might suffice to supply an intelligible principle in some circumstances, it certainly won't always. And once again it's hard to see

18

how the discretion conferred here is anything less than extraordinary — in its breadth (allowing the Attorney General to apply none, some, or all of SORNA's requirements to none, some, or all past offenders), in its subject matter (effectively defining a new crime), in its chosen delegate (the nation's top prosecutor), and in the number of people affected (half a million). All factors suggesting more, not less, guidance is required.

Neither is it any answer to say that, though the Attorney General wants for any intelligible principle to guide him in deciding which requirements to impose on which past offenders, at least his discretion finds some boundaries in the statute (he cannot exceed the full application of all of SORNA's requirements). Delegation doctrine teaches that Congress must set *both* the "boundaries" of the Executive's discretion *and* supply an "intelligible principle" for the exercise of that discretion within those boundaries. *Mistretta*, 488 U.S. at 372-73. After all and again, the point of the delegation doctrine isn't so much that some poor Executive agent tasked with the thankless job will necessarily perform poorly within the bounds and metes of the discretion set for him. It is that decoupling the exercise of his discretion so much from legislative direction deprives the people of the structural protections guaranteed by the first section of the first article of the Constitution.

There remains much less room still for debate about the proper outcome of this case when the "intelligible principle" test gives way to a more "meaningful" one in the criminal setting. After all, SORNA's delegation contains none of the three factors that *Touby* found reassuring and that circuit courts have since used to assess delegation challenges in the criminal context. First, the statute provides no generally applicable rule for past offenders for the Attorney General to follow contingent only on specified factual findings. Rather, the Attorney General may apply all, some or none of the requirements of the Act however he sees fit. Second, the statute requires no factual findings of the Attorney General of any kind. Third, it offers no guidance about these non-existent factual findings.

To be sure, Congress could have easily written a statute with such constraints, and to remedy the delegation problem here it might still. For example, Congress could have tasked the Attorney General with the job of determining what factors correlate with recidivism or present an unreasonable danger to the public and make his determinations based on those considerations. When deciding which past offenders should be required to register Congress could have required the Attorney General to examine, as well, factors like the recency of the violation; the nature of the sex offense; the number of past violations; the offender's age, family, residential, or occupational circumstances; or the offender's mental or physical health — or banned consideration of any of these factors. It's easy to imagine all sorts of ways Congress might have

20

constrained — and might still constrain — the Attorney General's discretion in ways parallel to *Touby*. But and by the government's own admission, we have nothing of the kind here. And that leaves us well outside the ballpark when it comes to satisfying *Touby*'s test. Indeed, you might wonder if we are even on Yawkey Way. *See* Sadik, *supra* n.1, at 298 (arguing that SORNA fails *Touby*'s test).

Delegation doctrine may not be the easiest to tease out and it has been some time since the Court has held a statute to cross the line. But it has also been some time since the courts have encountered a statute like this one — one that, if allowed to stand, would require the Judiciary to endorse the notion that Congress may effectively pass off to the prosecutor the job of defining the very crime he is responsible for enforcing. By any plausible measure we might apply that is a delegation run riot, a result inimical to the people's liberty and our constitutional design.