REBECCA GRASSL BRADLEY, J. (concurring).
¶42 The majority correctly upholds the constitutionality of the legislature's decision to require gubernatorial *576 approval of administrative rulemaking. I join the opinion except for those portions espousing the ostensible importance and necessity of the legislature's delegation of power to the administrative state. See majority op., ¶17.[1] The concentration of power within an administrative leviathan clashes with the constitutional allocation of power among the elected and accountable branches of government at the expense of individual liberty. Although this case does not involve a challenge to the constitutionality of legislative delegations of power to administrative agencies, I encourage the court to be mindful of the structural separation of powers and the safeguards it employs to preserve the rule of law.
¶43 The majority repeats the judiciary's longstanding perception that "the delegation of the power to make rules and effectively administer a given policy is a necessary ingredient of an efficiently functioning government." Majority op., *612 ¶17 (quoting Gilbert v. Medical Examining Bd., 119 Wis. 2d 168, 184, 349 N.W.2d 68 (1984) (emphasis added)). The majority reiterates the notion that "[o]ur government could not efficiently operate without the administrator and administrative agency." Majority op., ¶17 (quoting Schmidt v. Department of Res. Dev., 39 Wis. 2d 46, 58, 158 N.W.2d 306 (1968) (emphasis added)). The majority restates discredited principles, disregarding the incompatibility of "the system of bureaucratic rule that took root in the Progressive era and now reaches into *577 virtually every realm of American life,"[2] with the constitution's "deliberate calibration of incentives and control between the branches" reflected in the structural separation of powers. Gabler v. Crime Victims Rights Bd., 2017 WI 67, ¶7, 376 Wis. 2d 147, 897 N.W.2d 384.
¶44 The idea that the administrative state is necessary for good and efficient government "reflect[s] this belief that bureaucrats might more effectively govern the country than the American people" and facilitated "the progressives usher[ing] in significant expansions of the administrative state, ultimately culminating in the New Deal." Perez v. Mortgage Bankers Ass'n, --- U.S. ----, 135 S. Ct. 1199, 1223 n.6, 191 L.Ed.2d 186 (2015) (Thomas, J., concurring). Underlying the movement toward a burgeoning administrative state was the governing class's sneering contempt for the people who elect its members, along with impatience at any resistance of the people to the views of the enlightened:
In government ... the hardest of hard things is to make progress.... Nowadays the reason is that the many, the people, who are sovereign have no single ear which one can approach, and are selfish, ignorant, timid, stubborn, or foolish with the selfishnesses, the ignorances, the stubbornnesses, the timidities, or the follies of several thousand persons,-albeit there are hundreds who are wise.
Woodrow Wilson, The Study of Administration, Political Science Quarterly, Vol. 2, No. 2, 197, 207-08 (June 1887). Wilson lamented the inability of the unwashed masses to appreciate the suppositions of "perfectly instructed heads" who would produce "infallible, placidly *578 wise maxims of government" because "[t]he bulk of mankind is rigidly unphilosophical, and nowadays [alas!] the bulk of mankind votes." Id. at 209.
¶45 The philosophical roots of rule by bureaucratic overlords are antithetical to the Founders' vision of our constitutional Republic, in which supreme power is held by the people through their elected representatives, and "the creation of rules of private conduct" is "an irregular and infrequent occurrence." DOT v. Association of Am. R.Rs., --- U.S. ----, 135 S. Ct. 1225, 1252, 191 L.Ed.2d 153 (2015) (Thomas, J., concurring). The people can keep their rightful powers only if each branch of government "jealously guard[s]" the responsibilities the people conferred upon them. Gabler, 376 Wis. 2d 147, ¶31, 897 N.W.2d 384 (quoting Barland v. Eau Claire Cty., 216 Wis. 2d 560, 573, 575 N.W.2d 691 (1998) ). "The co-ordinate branches of the government ... should not abdicate or permit others to infringe upon such powers as are exclusively committed to them by the Constitution." Rules of Court Case, 204 Wis. 501, 514, 236 N.W. 717 (1931). Transferring to administrative agencies the core legislative duty of making laws *613 abnegates powers the people gave their elected representatives. The consolidation of power within executive branch agencies "often leaves Americans at the[ir] mercy" endowing agencies with "a nearly freestanding coercive power" and "[t]he agencies thereby become rulers of a sort unfamiliar in a republic, and the people must jump at their commands." Phillip Hamburger, Is Administrative Law Unlawful? 335 (2014).
¶46 More recently, "necessity" as a justification for the administrative state has been tied to the philosophy of a living constitution, under which the law may be molded to reflect changing circumstances in society, regardless of what the text actually says.
*579 Hamburger, supra ¶4, at 429. Living constitutionalism is grounded in sociology, not the law,[3] and is inconsistent with the founding principle that "[t]o adapt the law to changing circumstances ... the collective wisdom of the people's representatives is needed." Gutierrez-Brizuela v. Lynch, 834 F.3d 1142, 1149 (10th Cir. 2016) (Gorsuch, J., concurring). Those to whom the people have conferred constitutional powers may not circumvent those grants simply "because they believe that more or different power is necessary." A.L.A. Schechter Poultry Corp. v. United States, 295 U.S. 495, 529, 55 S.Ct. 837, 79 L.Ed. 1570 (1935). Necessity "cannot be allowed to obscure the limitations of the authority to delegate, if our constitutional system is to be maintained." Id. at 530, 55 S.Ct. 837. Even "[e]xtraordinary conditions do not create or enlarge constitutional power." Id. at 528, 55 S.Ct. 837.
¶47 The United States and Wisconsin Constitutions both vest exclusive powers in each of three independent branches of government, not four. "The Constitution does not vest the Federal Government with an undifferentiated 'governmental power,' " but rather, it "identifies three types of governmental power and, in the Vesting Clauses, commits them to three branches of Government." Association of Am. R.Rs., 135 S. Ct. at 1240 (Thomas, J., concurring). Like the federal system, the Wisconsin Constitution establishes three branches of government, and "[t]he separation of powers doctrine is implicit in this tripartite division." Gabler, 376 Wis. 2d 147, ¶11, 897 N.W.2d 384 (quoting Panzer v. Doyle, 2004 WI 52, ¶48, 271 Wis. 2d 295, 680 N.W.2d 666 ; alteration in original). Article IV, Section 1 "vest[s]" the "legislative power ... in a senate and assembly"; Article V, Section 1 "vest[s]" the "executive power ... in a *580 governor"; and Article VII, Section 2 "vest[s]" the "judicial power of this state ... in a unified court system." See Gabler, 376 Wis. 2d 147, ¶11, 897 N.W.2d 384. These constitutional "grants are exclusive," which has been understood to mean "only the vested recipient of that power can perform it." Association of Am. R.Rs., 135 S. Ct. at 1241 (Thomas, J., concurring).
¶48 "The people bestowed much power on the legislature, comprised of their representatives whom the people elect to make the laws." Gabler, 376 Wis. 2d 147, ¶60, 897 N.W.2d 384. "The separation of powers 'operates in a general way to confine legislative powers to the legislature.' " League of Women Voters of Wis. v. Evers, 2019 WI 75, ¶35, 387 Wis. 2d 511, 10 N.W.2d 180 (quoting Goodland v. Zimmerman, 243 Wis. 459, 467, 929 N.W.2d 209 (1943)). Applying an originalist interpretation of the Constitution, some United States Supreme Court justices and several commentators have opined against the legislature relinquishing its vested legislative power "or otherwise reallocat[ing] it," echoing the historical understanding that "[t]he legislative c[ould not] transfer the *614 power of making laws to any other hands: for it being but a delegated power from the people, they who have it [could not] pass it over to others." Association of Am. R.Rs., 135 S. Ct. at 1243-44 (Thomas, J., concurring) (quoting John Locke, Second Treatise of Civil Government § 141, 71 (J. Gough ed. 1947) (emphasis added; alterations in original)). See also Richard A. Epstein, Why the Modern Administrative State Is Inconsistent with the Rule of Law, 3 N.Y.U.J. of Law & Liberty 491, 496 (2008) (the argument "that the Constitution authorizes the creation of independent agencies with aggregated powers of a legislative, executive, and judicial nature ... fails so long as it depends on any form of originalism" and "the *581 text itself points to a system whereby the tripartite division is meant to be rigid in law"); Hamburger, supra ¶4, at 336 ("[T]he government can bind Americans only through laws, and only through courts with juries and judges, thus preserving the most basic conditions of freedom.")
¶49 Although a revival of the non-delegation doctrine has not garnered the votes of a majority on the Court, this was not always the case. In the past, the Court recognized "[t]he Congress is not permitted to abdicate or to transfer to others the essential legislative functions with which it is thus vested." A.L.A. Schechter Poultry Corp, 295 U.S. at 529, 55 S.Ct. 837. Despite acknowledging that the constitutional "text permits no delegation of those [legislative] powers" the Court has afforded much leeway for the legislature to transfer its constitutional powers to executive branch agencies, provided that "when Congress confers decisionmaking authority upon agencies Congress must 'lay down by legislative act an intelligible principle to which the person or body authorized to [act] is directed to conform.' " Whitman v. American Trucking Ass'ns, Inc., 531 U.S. 457, 472, 121 S.Ct. 903, 149 L.Ed.2d 1 (2001) (alteration in original). However, "the Constitution does not speak of 'intelligible principles.' Rather, it speaks in much simpler terms: 'All legislative Powers herein granted shall be vested in a Congress.' " Id. at 487, 121 S.Ct. 903 (Thomas, J., concurring).
¶50 Reallocating the making of rules, voluminous in number and significant in substance, from the legislature to administrative agencies housed within the executive branch, aggrandizes the power of the latter, at the risk of replacing the rule of law with the rule of men:
The idea that the Executive may not formulate *582 generally applicable rules of private conduct ... has ancient roots in the concept of the 'rule of law,' which has been understood ... to mean that a ruler must be subject to the law in exercising his power and may not govern by will alone.
Association of Am. R.Rs., 135 S. Ct. at 1242 (Thomas, J., concurring) (quoted source omitted). The concept of the rule of law "presupposes at least two distinct operations, the making of law, and putting it into effect." Id. (quoted source omitted; emphasis added). Delegating legislative functions to administrative agencies transforms the executive from the executor of laws into the lawmaker. Blackstone-whose separation of powers principles "profoundly influenced" the Founders-"defined a tyrannical government as one in which 'the right both of making and of enforcing the laws, is vested in one and the same man, or one and the same body of men,' for 'wherever these two powers are united together, there can be no public liberty.' " Id. at 1244 (quoted source omitted).
¶51 The Founders recognized that maintaining the formal separation of powers *615 was essential to preserving individual liberty.
This devotion to the separation of powers is, in part, what supports our enduring conviction that the Vesting Clauses are exclusive and that the branch in which a power is vested may not give it up or otherwise reallocate it. The Framers were concerned not just with the starting allocation, but with the "gradual concentration of the several powers in the same department." The Federalist No. 51, at 321 (J. Madison).
Id. "Under the original understanding of the Constitution," the function of creating "generally applicable rules of private conduct ... requires the exercise of legislative power," and "the discretion inherent in *583 executive power does not comprehend the discretion to formulate generally applicable rules of private conduct." Id. at 1242. The judiciary, however, has blurred the lines distinguishing legislative power from executive power, classifying rulemaking as executive in nature rather than the core legislative function it was formerly recognized to be. See id. at 1246.
¶52 The Wisconsin Constitution replicates the "separation of powers principles[ ] established at the founding of our nation and enshrined in the structure of the United States Constitution." See Gabler, 376 Wis. 2d 147, ¶11, 897 N.W.2d 384. " 'Each branch has exclusive core constitutional powers into which other branches may not intrude.' " Id., ¶30 (quoting State v. Horn, 226 Wis. 2d 637, 643, 594 N.W.2d 772 (1999) ). These zones "are to be jealously guarded by each branch of government." Gabler, 376 Wis. 2d 147, ¶31, 897 N.W.2d 384 (quoting Barland, 216 Wis. 2d at 573, 575 N.W.2d 691 ) (internal marks omitted).
¶53 The concept of the administrative state is nonexistent in either the United States or Wisconsin Constitutions, which means "administrative power runs outside the law." Hamburger, supra ¶4, at 6.
We have too long abrogated our duty to enforce the separation of powers required by our Constitution. We have overseen and sanctioned the growth of an administrative system that concentrates the power to make laws and the power to enforce them in the hands of a vast and unaccountable administrative apparatus that finds no comfortable home in our constitutional structure. The end result may be trains that run on time (although I doubt it), but the cost is to our Constitution and the individual liberty it protects.
Association of Am. R.Rs., 135 S. Ct. at 1254-55 (Thomas, J., concurring). In facilitating the vast expansion of the administrative state, the legislative and *584 executive branches transferred power from the people's elected representatives and elected executives, bestowing it upon unelected and unaccountable bureaucrats, thereby jeopardizing the constitution's safeguards against the tyrannical concentration of power. "The administrative regime consolidates in one branch of government the powers that the Constitution allocates to different branches" resulting in "the exercise of power outside and above the law." Hamburger, supra ¶4, at 6.
To the Framers of the United States Constitution, the concentration of governmental power presented an extraordinary threat to individual liberty: "The accumulation of all powers, legislative, executive, and judiciary, in the same hands, whether of one, a few, or many, ... may justly be pronounced the very definition of tyranny." The Federalist No. 47, at 298 (James Madison) (Clinton Rossiter ed., 1961).
Gabler, 376 Wis. 2d 147, ¶4, 897 N.W.2d 384 (ellipsis by Gabler ).
*616 ¶54 In Tetra Tech EC, Inc. v. Wisconsin Department of Revenue, 2018 WI 75, 382 Wis. 2d 496, 914 N.W.2d 21, we "end[ed] our practice of deferring to administrative agencies' conclusions of law," thereby reclaiming the judiciary's constitutionally-vested authority to say what the law is. Id., ¶3 (Kelly, J., lead opinion).[4] Rather than placidly accepting the administrative state as a necessary appendage to the government, this court should reconsider its acquiescence to subdelegations[5] of legislative power to administrative *585 agencies within the executive branch when the appropriate case presents the opportunity. It "is the obligation of the Judiciary not only to confine itself to its proper role, but to ensure that the other branches do so as well." City of Arlington v. F.C.C., 569 U.S. 290, 327, 133 S.Ct. 1863, 185 L.Ed.2d 941 (2013) (Roberts, C.J., dissenting). In this case, however, none of the parties raise the issue of whether "our delegation jurisprudence has strayed too far from our Founders' understanding of separation of powers." Whitman, 531 U.S. at 487, 121 S.Ct. 903 (Thomas, J., concurring).
¶55 Passing legislation sometimes requires political courage. Legislative initiatives may move slowly and some bills never become laws. Consequently, "Congress often prefers to set a politically uncontroversial goal and leave it to the agencies to figure out the politically controversial means of achieving that goal." Charles J. Cooper, Confronting the Administrative State, 25 National Affairs 96, 103 (Fall 2015). Returning all lawmaking responsibilities to the legislature would remove the shroud over administrative rulemaking, placing the lawmaking process back in the public eye where it constitutionally belongs.
¶56 The objective of our Founders was not an "efficiently functioning government."[6] The Founders designed a Constitution to safeguard individual rights and liberty. The Wilsonian vision of rule by enlightened bureaucrats diminishes the power of the people, in derogation of the principles on which America was *586 founded. "The vesting of legislative power in a distinct political body is a stumbling block to modern intellectuals and a stone rejected by the builders of the federal bureaucracy, but it has been and remains a cornerstone in the constitutional architecture of free government." Texas v. United States, 300 F. Supp. 3d 810, 841 (N.D. Tex. 2018). "Admittedly, the legislative process can be an arduous one. But that's no bug in the constitutional design: it is the very point of the design." Gutierrez-Brizuela, 834 F.3d at 1151 (Gorsuch, J., concurring).
By separating the lawmaking and law enforcement functions, the framers sought to thwart the ability of an individual or group to exercise arbitrary or absolute power. And by restricting lawmaking to one branch and forcing any legislation to endure bicameralism and presentment, the framers sought to make the task of lawmaking more arduous still.
*617 United States v. Nichols, 784 F.3d 666, 670 (10th Cir. 2015) (Gorsuch, J., dissenting). The "inefficiency" inherent in the legislative process " 'serves a valuable' liberty-preserving 'function.' " Id. (quoted source omitted). "While the separation of powers may prevent us from righting every wrong, it does so in order to ensure that we do not lose liberty." Morrison v. Olson, 487 U.S. 654, 710, 108 S.Ct. 2597, 101 L.Ed.2d 569 (1988) (Scalia, J., dissenting).
¶57 "The Framers could hardly have envisioned ... the authority administrative agencies now hold over our economic, social, and political activities." City of Arlington, 569 U.S. at 313, 133 S.Ct. 1863 (Roberts, C.J., dissenting). Rather than extolling the necessity of the administrative behemoth in Wisconsin, this court should "glance at the Constitution to see what it says about how [governmental] authority must be exercised *587 and by whom." See Association of Am. R.Rs., 135 S. Ct. at 1240 (Thomas, J., concurring). Through the Wisconsin Constitution, the people conferred exclusive powers on an elected executive, an elected legislature, and an elected judiciary, respectively. Noticeably absent from the Wisconsin Constitution is any apportionment of power to unelected and unaccountable administrators. Because the majority lends unquestioned credence to the extra-constitutional apparatus of the administrative state, I respectfully concur.

See majority op., ¶7 ("The REINS Act did not alter Act 21's requirement that an agency (1) submit a statement of scope to the governor for approval prior to drafting a proposed rule, and (2) submit a final draft of a rule to the governor for approval before submitting it to the legislature.").

"Stare decisis" is fundamental to the rule of law. Johnson Controls, Inc. v. Emp'rs Ins. of Wausau, 2003 WI 108, ¶94, 264 Wis. 2d 60, 665 N.W.2d 257. It refers to the principle that requires courts to "stand by things decided." State v. Harrell, 199 Wis. 2d 654, 667, 546 N.W.2d 115 (1996) (Abrahamson, J., concurring); see Black's Law Dictionary 1626 (10th ed. 2014) defining "stare decisis" as "[t]he doctrine of precedent, under which a court must follow earlier judicial decisions when the same points arise again in litigation").

Article X, Section 1 of the Wisconsin Constitution provides:
The supervision of public instruction shall be vested in a state superintendent and such other officers as the legislature shall direct; and their qualifications, powers, duties and compensation shall be prescribed by law. The state superintendent shall be chosen by the qualified electors of the state at the same time and in the same manner as members of the supreme court, and shall hold office for 4 years from the succeeding first Monday in July. The term of office, time and manner of electing or appointing all other officers of supervision of public instruction shall be fixed by law.

See also Coyne v. Walker, 2016 WI 38, ¶80, 368 Wis. 2d 444, 879 N.W.2d 520 (Abrahamson, J., concurring) ("I conclude, as do the lead opinion (which represents the views of only Justice Gableman) and Justice Prosser's concurrence, that 2011 Wis. Act 21, which altered the process of administrative rulemaking, is unconstitutional as applied to the Superintendent of Public Instruction and the Department of Public Instruction."); id., ¶155 (Prosser, J., concurring) (concluding that Act 21 is unconstitutional "because it would give a governor authority to obstruct the work of an independent constitutional officer to such an extent that the officer would be unable to discharge the responsibilities that the legislature has given him. An absolute veto power over a proposed rule is a check without a balance.").

This court previously determined in Thompson that the former powers of the elected SPI cannot constitutionally be given to appointed "other officers" at the state level who are not subordinate to the SPI. Thompson v. Craney, 199 Wis. 2d 674, 678, 546 N.W.2d 123 (1996).

Majority op., ¶17.